# EXHIBIT A

Page 1

1              UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION
3    RUDY CARMONA,                )
                                  )
4              Plaintiff,         )
                                  )
5    VS.                          ) CASE NO.: 4:21-CV-01473
                                  )
6    KILGORE INDUSTRIES,          )
                                  )
7              Defendant.         )
8
9
10         ------------------------------------
11                  ORAL DEPOSITION OF
12                  RUDY SAM CARMONA
13                    APRIL 8, 2022
14         ------------------------------------
15
16      ORAL DEPOSITION OF RUDY SAM CARMONA, produced as a
17   witness at the instance of the DEFENDANT, and duly
18   sworn, was taken in the above-styled and numbered cause
19   on April 8, 2022, from 8:41 a.m. to 1:32 p.m., before
20   Lisa M. Durham, CSR in and for the State of Texas,
21   reported by machine shorthand, at the location of the
22   witness, City of Porter, County of Montgomery, State of
23   Texas, pursuant to the Federal Rules of Civil Procedure
24   and the provisions stated on the record or attached
25   hereto.
     Job No. CS5149584

Page 2

```
 1                    A P P E A R A N C E S
 2
 3     FOR THE PLAINTIFF:
 4          Mr. Eddie Hodges, Jr.  (Appearing Via Zoom)
            KENNARD LAW P.C.
 5          5120 Woodway Drive, Suite 10010
            Houston, Texas  77056
 6          (855) 499-4514
            eddie.hodges@kennardlaw.com
 7
 8     FOR THE DEFENDANT:
 9          Ms. Sonia B. Alfaro  (Appearing Via Zoom)
            MEADERS & ALFARO
10          Two Riverway, Suite 845
            Houston, Texas  77056
11          (713) 403-3125
            salfaro@meaderslaw.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                          INDEX
                                                    PAGE
2

Appearances....................................... 2
3

RUDY SAM CARMONA
4

        EXAMINATION BY MS. ALFARO.................... 4
5       EXAMINATION BY MR. HODGES...................143
6 Corrections and Signature Page..................162
Reporter's Certification........................163
7
8

                       EXHIBITS
9

NO.              DESCRIPTION              MARKED    ID'D
10

Exhibit 1      Email from Paul
11             Therriault, 11/9/20,
               Carmona 0001             146       146
12

Exhibit 2    Halliburton Spreadsheet   156       156
13
14

             REQUESTED DOCUMENTS/INFORMATION
15
16 NO. DESCRIPTION                                 PAGE
17 1    All Text Messages............................ 23
18
19
20
21
22
23
24
25

Page 4

| | |
|---|---|
| 1 | PROCEEDINGS |
| 2 | (April 8, 2022, 8:41 a.m.) |
| 3 | RUDY SAM CARMONA, |
| 4 | having been first duly sworn, testified as follows: |
| 5 | EXAMINATION |
| 6 | BY MS. ALFARO: |
| 7 | Q.  Good morning, Mr. Carmona.  How are you? |
| 8 | A.  Good. |
| 9 | Q.  So let me start by asking you, have you been |
| 10 | deposed before? |
| 11 | A.  No, ma'am. |
| 12 | Q.  So let's talk a little bit about that before we |
| 13 | jump right into the deposition.  And just for the |
| 14 | purposes of the record, can you state again your full |
| 15 | name, please? |
| 16 | A.  Rudy Sam Carmona, Junior. |
| 17 | Q.  And your official first name is Rudy?  That's |
| 18 | not a nickname? |
| 19 | A.  Yes, it's Rudy. |
| 20 | Q.  Okay.  Thank you.  Well, let me explain what's |
| 21 | going to happen today virtually.  I'm going to be asking |
| 22 | you some questions.  I am legal counsel for the |
| 23 | defendant, Kilgore, in this matter, and based on the |
| 24 | allegations that you've made in the complaint, I'm |
| 25 | going to be asking you some questions that I need for |

FOR READING & SIGNING ONLY

Page 5

1    you to respond.

2                    Now, most important thing is, if you don't

3    understand or can't hear one of my questions, please let

4    me know.  Number two, since this is all happening

5    virtually, I need to know whether there is somebody in

6    the room with you or not at this time.

7         A.  No.

8         Q.  Okay.  And the reason I'm asking is when you

9    move around, I see somebody in the back of you.  So I

10   don't know what's going on.

11        A.  What do you mean when I move around?  I'm in my

12   office.

13        Q.  Okay.  Now, because we're doing this virtually,

14   there is potential, as you saw at the beginning, for

15   some things in the internet and the connection to go a

16   little bit wrong, and that means I might not be able to

17   listen to what you're saying, or vice versa, or we may

18   freeze up.

19                    If anything of that nature happens on your

20   end, please let me know because there's no way for me to

21   know other than I see you frozen or whatnot.  But again,

22   if you don't tell me that you haven't listened to or

23   weren't able to listen to or weren't able to grasp my

24   question, I'm going to understand that you're responding

25   to my questions as asked.  Okay?

Page 6

1      A.   Okay.

2      Q.   If you need a break at any point in time,

3   that's okay.  Just let me know.  The only thing is, if I

4   have posed a question, I'm going to require that you

5   respond to that question before we go on a break.  Okay?

6      A.   Okay.

7      Q.   As of right now, any questions that you have

8   regarding the proceedings?

9      A.   No.

10      Q.   Okay.  Then let's begin.  I remind you that you

11   are under oath and you will remain under oath throughout

12   the duration of the deposition.  Okay?

13      A.   Okay.

14      Q.   Are you taking any medication or have you taken

15   any medication today or anytime here today that would

16   not allow you to understand or respond to the questions

17   that I'll be posing for you?

18      A.   No.

19      Q.   I forgot to mention one more.  During the

20   deposition, there is a court reporter, so everything

21   that you say and I say is being transcribed.  From time

22   to time -- and it typically happens.  It's very natural

23   and normal.

24           Throughout the deposition, there might be

25   points in time where you start using gestures, like

1   nodding your head and stuff like that or saying uh-huh

2   in order to respond to my questions.  If that were to

3   happen, I'm going to do the signal for you so that you

4   know you need to verbalize the response in order to have

5   a complete transcript.  Okay?

6          A.   Okay.

7          Q.   So tell me, what is your current address?

8          A.   25525 Ramrock Drive, Porter, Texas, 77365.

9          Q.   Since when do you live in this address?

10         A.   Since December -- I don't know the exact day.

11   Second week of December of 2020.

12         Q.   Do you live there by yourself or with somebody

13   else?

14         A.   With my wife and kids.

15         Q.   What is your wife's name?

16         A.   Jacqueline Nicole Carmona.

17         Q.   And your kids, are they minors or are they --

18         A.   Twelve, ten and four.

19         Q.   Since when have you been married to Jacqueline?

20         A.   April 5th of 2009.

21         Q.   And all three kids that live with you are kids

22   between you and Jacqueline?

23         A.   Yes.

24         Q.   Prior to this marriage, have you ever been

25   married?

Page 8

1      A.   No.

2      Q.   What is your date of birth?

3      A.   6/4/81.

4      Q.   Where were you born?

5      A.   Houston, Texas.

6      Q.   And what would you say is your race?

7      A.   Hispanic.

8      Q.   Why do you claim your race is Hispanic?

9      A.   My mother and father's heritage is from Mexico.

10     Q.   Was your mother born in Mexico?

11     A.   Yes.

12     Q.   Was your father born in Mexico?

13     A.   No.  He was born here.

14     Q.   Pursuant to your prior testimony, you were born

15  in the United States, correct?

16     A.   Yes.

17     Q.   Okay.  Besides your three children, do you have

18  any other dependents?

19     A.   Any other dependents?

20     Q.   Yes, sir.

21     A.   Currently, no.

22     Q.   Let's talk about the preparation for this

23  deposition, but before we do, let me explain something

24  to you.  I do not -- again, I repeat, I do not want to

25  know anything you spoke or discussed with your attorney

Page 9

1    with regards to the questions I will be posing.  Okay?

2         A.   Okay.

3         Q.   Did you prepare for this deposition?

4         A.   Huh?

5         Q.   Did you prepare for this deposition?

6         A.   Did I prepare for this deposition?  Yeah,

7    through prayer.

8         Q.   Did you review any documents in preparation for

9    this deposition?

10        A.   No.

11        Q.   Did you talk to anybody besides your attorney

12   in preparation for this deposition?

13        A.   Yes, my wife.

14        Q.   What did you speak with your wife?

15        A.   How she's been -- she's had a deposition

16   before, so I wanted to know how some of the questions

17   might be.

18        Q.   Did you talk to anybody else with regards to

19   this deposition?

20        A.   No.

21        Q.   With regards to your job at Kilgore, do you

22   keep or kept any journals, notebooks, notes with regards

23   to your allegations or your employment with them?

24        A.   Notebooks?  Any notebooks, no.

25        Q.   Let me be clear.  Notebooks, journals, notes,

Page 10

1    any of those things?

2         A.   No.   There was no notebooks handed out by

3    Kilgore that I kept.

4         Q.   Okay.   So again, I'm going to be clear.   They

5    don't necessarily have to be notebooks handed out by

6    Kilgore.   They could be journals or notes that you took

7    with regards to your employment with them.   Do you have

8    any of that?

9         A.   Any notes?   Any notes that were mine were mine.

10   Any notes that were Kilgore's were Kilgore's.

11        Q.   I understand that.   But my question is, did you

12   keep any sort of notes, journals, notebooks with regards

13   to your employment at Kilgore?

14        A.   No.   Anything that was mine was mine.   Anything

15   that was Kilgore's was Kilgore's.   I did not keep any

16   special notes.

17        Q.   And when I say keep, I mean -- because I want

18   to be clear amongst us -- any annotations, any notes,

19   any daily notes or kind of record that you kept with

20   regards to your employment with them, even if they were

21   yours.

22        A.   I'm trying to remember any special notes that

23   were mine that pertained to work.   I don't -- I don't

24   remember any special notes or notebooks or --

25        Q.   Since your employment with Kilgore ended, have

Page 11

1    you spoken with anybody in the company?

2         A.   Have I spoken with anybody in the company?

3         Q.   Meaning employed by the company or contracted

4    by the company.

5         A.   No.

6         Q.   Since your employment with the company ended,

7    have you spoken with any company, Kilgore company

8    clients?

9         A.   Company Kilgore clients?   I've spoken with my

10   clients.

11        Q.   When you talk about your clients, those clients

12   would have been previous clients of Kilgore?

13        A.   Yes.

14        Q.   Okay.   Who would those be?

15        A.   Those clients are my clients.

16        Q.   I understand, sir.   What are their names?

17        A.   Halliburton, FMC.

18        Q.   Who in Halliburton did you speak with?

19        A.   Do I speak with that are my clients?

20        Q.   Yes, sir.

21        A.   These are the site managers to the locations

22   that I deal with.

23        Q.   What are their names?

24        A.   I'm trying to understand why you need their

25   names.

Page 12

1      Q.  Sir, I'm here to ask you questions, and you're

2   here to respond to them.  So what are their names?

3      A.  James Workman.

4      Q.  Can you repeat that last name again, please?

5      A.  James Workman.

6      Q.  Can you spell that last name?

7      A.  W-o -- W-o-r-k-m-a-n.

8      Q.  Who else?

9      A.  Damon Benson (phonetic).

10     Q.  Who else?

11     A.  Alan -- Alan Vera.

12     Q.  Who else?

13     A.  Paul Woods.

14     Q.  Paul who?

15     A.  Paul Woods.

16     Q.  Okay.  Who else?

17     A.  That's it from Halliburton.

18     Q.  Okay.  Any other client that was a previous

19   client of Kilgore that you speak with?

20     A.  Yeah, the FMC.

21     Q.  And who at FMC do you speak with or have spoken

22   with since you ended your relationship with Kilgore?

23     A.  Josh Bussleman.

24     Q.  Anybody else?

25     A.  That's it.

Page 13

1    Q.  Now, with regards to Josh, have you spoken with

2  him anything regarding this complaint that you have

3  filed against Kilgore?

4    A.  This complaint?

5    Q.  Yes, sir.

6    A.  No.

7    Q.  So if I were to call Josh, he would know

8  nothing about the fact that you filed a complaint

9  against Kilgore?

10    A.  If you was to call Josh? Not about the

11  complaint, but he knows that -- about the project that

12  ended right around the time I was let go.

13    Q.  Okay.  What does he know about that project?

14  First and foremost, what's the project's name or how is

15  it identified?

16    A.  Air rotation units.

17    Q.  And those air -- that air rotation unit project

18  would be at FMC?

19    A.  Yes.  The only --

20    Q.  I'm sorry.  Go ahead.

21    A.  The only reason why he would know is because I

22  was about 99 percent done when I was let go.  So he was

23  very -- he was very adamant to try to find out what

24  happened to me.

25    Q.  Okay.

Page 14

1      A.  Because I was the main -- I was the project

2  manager.

3      Q.  Let's take this step-by-step.  There's no

4  question on the table.

5          So you were still working for Kilgore while

6  doing this air rotation units project, correct?

7      A.  Yes.

8      Q.  And your conversations with Josh about this

9  project happened during the time you were employed by

10  Kilgore, after or both?

11      A.  Say it again.

12      Q.  The conversations you had with Josh Bussleman

13  were during the time you were employed by Kilgore, after

14  your relationship -- employment relationship with

15  Kilgore ended or during, both?

16      A.  No, after he called me and I said they let me

17  go so I'm no longer available for that project.

18      Q.  Okay.  Let's talk a little bit about that.  Did

19  Josh have your cell phone number?

20      A.  Yes.  He had both my numbers.

21      Q.  Okay.  And you stated just a minute ago that he

22  called you after you were terminated from Kilgore?

23      A.  Yes.

24      Q.  Okay.  And do you recall when exactly after

25  your termination he called you?

Page 15

1          A.  I don't.  I mean, it was days after.

2          Q.  When he called you, what's your best

3     recollection of what he told you?

4          A.  What happened?  I said, well, they just let me

5     go.  I didn't tell him the details, but he was obviously

6     trying to figure out what happened.

7          Q.  Did he say anything else to you?

8          A.  No, just what happened.  I said, well, I can't

9     explain it right now.  Obviously, I didn't hire Kennard

10    Law until maybe months later, so there was no legal

11    stuff to talk about.

12         Q.  Any other conversations you had with Josh with

13    regards to your employment at Kilgore?

14         A.  Say it again.

15         Q.  Any other conversations you might have had with

16    Josh regarding your employment at Kilgore, even if it --

17    if they were after your termination?

18         A.  No.  It's just I was no longer available for

19    the project.

20         Q.  Now, you work -- you stated FMC is a client of

21    yours currently?

22         A.  Not officially.  I've quoted, but I have not --

23    I have not been rewarded any projects.  So not

24    officially.

25         Q.  Have you done any work for them after your

Page 16

1    termination from Kilgore unofficially?

2         A.   Have I done any unofficial, no.

3         Q.   How many quotes have you provided them?

4         A.   Maybe three.

5         Q.   Were these projects different to the ones you

6    worked for at Kilgore?

7         A.   Yes.

8         Q.   You also stated that you had spoken with

9    Halliburton, and apparently, they were clients of

10   Kilgore when you worked with Kilgore?

11        A.   I can say that they were clients of Kilgore and

12   Rudy Carmona.

13        Q.   Okay.  When you say they were clients of

14   Rudy Carmona, that means that you worked for Halliburton

15   while employed for Kilgore?

16        A.   No.  It means I went and got these clients.

17        Q.   And you got these clients in representation of

18   Kilgore, as -- working as a salesperson for Kilgore?

19        A.   Yes.

20        Q.   Okay.  My original question, if you recall, was

21   if you had conversations after termination with anybody

22   from Kilgore.  And one of the persons that you mentioned

23   or companies was Halliburton, and you mentioned four

24   site managers.  Do you currently do work for this

25   company?

Page 17

1          A.   Yes.

2          Q.   Okay.  Since when do you do work for this

3     company?

4          A.   March of -- March of '21, yeah.

5          Q.   And for the record, when was your last date of

6     work with Kilgore?

7          A.   October 26, 2020.

8          Q.   And how did you land working for Halliburton

9     after March 2021?

10         A.   Relationships I'd built for nine years.

11         Q.   Did you call them and ask if they -- if they

12    needed help?  How did that happen?

13         A.   Well, they had -- they were aware that I was no

14    longer at Kilgore.  So, yes, they reached out.

15         Q.   They reached out to you, or you reached out to

16    them?

17         A.   I guess you could say it was both because I

18    reached out to them, but there was -- they were very

19    well aware.

20         Q.   My question is simple.  Who reached out to who

21    first?  Did you reach out to Halliburton, or did

22    Halliburton reach out to you?

23         A.   I guess -- I guess it was both because at the

24    moment I was terminated, it was over.  I was getting

25    POs for Halliburton project, so they knew.  They knew at

Page 18

1   the moment.

2        Q.  Sir, my question is simple.  I'm going to

3   repeat it again.  Who initiated the contact?  Did

4   Halliburton contact you first --

5        A.  I guess I can say they did.

6        Q.  Let me finish my question.  Let me finish my

7   question.

8        A.  Well, there's no need to yell.  So they did.

9        Q.  I'm not yelling, sir, and as a matter of fact,

10  I'm not even in your same mode.  Okay?

11       A.  Well, they did.

12       Q.  Listen to --

13            MR. HODGES:  Mr. Carmona, you need to let

14  her just ask her question and just -- you know, just

15  answer the question when she asks -- after she asks,

16  please.  Just -- you know, we can just keep it as

17  cordial as possible going through this process.  Thank

18  you.

19            THE WITNESS:  Okay.

20       Q.  (BY MS. ALFARO)  The question is, who contacted

21  who first, and that's the only --

22       A.  They did.

23       Q.  Let me finish.  Did Halliburton contact you or

24  you contact Halliburton?

25       A.  They did.

Page 19

```
 1        Q.   Okay.   Who called you from Halliburton?
 2        A.   I think Damon did.   It was over the lab project
 3   because I was getting POs at the moment from the GC.
 4        Q.   You were getting POs from what?
 5        A.   The GC.
 6        Q.   And who was the GC?
 7        A.   The GC, D.E. Harvey.
 8        Q.   For Halliburton, did you ever work on a project
 9   for them that you also worked while employed at Kilgore?
10        A.   Repeat that again.
11        Q.   Sure.   Was there ever any project at
12   Halliburton that you worked while employed at Kilgore
13   and then while you were on your own?
14        A.   No.
15        Q.   Currently, are you self-employed?
16        A.   Yes.
17        Q.   What is the name of your company?
18        A.   RSC Mechanical and Primary Auto Glass.
19        Q.   Are these two separate companies?
20        A.   Yes.
21        Q.   Since when have you owned RSC Mechanical?
22        A.   Since I left Kilgore.
23        Q.   So your statement, testimony here today under
24   oath is that RSC Mechanical was opened by you after
25   October 26, 2020?
```

Page 20

1      A.  Well, the LegalZoom will show August of 2020,
2  but there was no -- no -- no projects that were done
3  after October 26th.  And bank statements can prove that,
4  so --
5      Q.  No projects done after October 26th by RSC
6  Mechanical?
7      A.  Yes.
8      Q.  So that means that -- strike that question.
9          Okay.  So you've just testified that
10  RSC Mechanical was formally organized or opened in
11  August 2020.  That's correct, right?
12      A.  Yes.
13      Q.  Who opened that company?  Did you open it up?
14  Did you hire somebody to do that?
15      A.  LegalZoom.
16      Q.  And in August 2020, you were employed by
17  Kilgore, correct?
18      A.  Yes.
19      Q.  Okay.  And RSC Mechanical, what was the purpose
20  of that company?  What was its main line of business or
21  is its main line of business?
22      A.  HVAC.
23      Q.  And you say HVAC.  Is that sales, repairs,
24  maintenance?  What is it?
25      A.  All that you listed.

Page 21

1    Q.  In August 2020, you've already stated you were

2    working at Kilgore.  What was your position in August

3    2020 at Kilgore?

4    A.  Service, sales estimator and project manager.

5    Q.  Of what?

6    A.  I was part of the service department.

7    Q.  And what did you sell, estimate and all of that

8    at Kilgore?  What type of service or product?

9    A.  Oh, anything and everything that was related to

10   HVAC, electrical or plumbing.

11   Q.  So the same thing that you did at Kilgore, you

12   were -- you would do for RSC Mechanical?

13   A.  No.  We do not do plumbing.

14   Q.  Besides plumbing, everything else that you did

15   at Kilgore, you would do for RSC Mechanical?

16   A.  There's some things that are limited, you know.

17   I'm not as big as Kilgore, so --

18   Q.  Okay.  So let's define this.  What things does

19   RSC Mechanical do that you also did at Kilgore, while

20   employed at Kilgore?

21   A.  Anything related to HVAC and light electrical

22   projects.

23   Q.  And, then, on the counterpart of that, what

24   would you have done while employed at Kilgore that you

25   don't do at RSC Mechanical?

Page 22

```
 1        A.   Just larger projects and plumbing at Kilgore.
 2        Q.   Okay.  When did RSC Mechanical obtain its first
 3   project?
 4        A.   Maybe a week or -- week or two after.
 5        Q.   After what?
 6        A.   After October 26th.
 7        Q.   When was the first time RSC Mechanical issued a
 8   quote?
 9        A.   Maybe first week of October.
10        Q.   And that would be first week of October 2020?
11        A.   Uh-huh.
12        Q.   Is that a yes?
13        A.   Yes.
14        Q.   During the first week of 2020, you were
15   employed at Kilgore, correct?
16        A.   Uh-huh, yes.
17        Q.   What was the first -- what company did you
18   issue that quote to?
19        A.   Dresser-Rand.
20        Q.   Can you repeat that, please?
21        A.   Dresser-Rand.
22        Q.   Besides this company, what other companies, if
23   any, did you issue a quote from RSC Mechanical while
24   still employed at Kilgore?
25        A.   Uh-huh.  Yes, ma'am.
```

Page 23

1      Q.   Okay.  So you issued quotes to other companies
2  besides Dresser while still employed at Kilgore under
3  RSC Mechanical?
4      A.   No.  He was -- he's the one that was adamant
5  since August.  He's one of the reasons why I started.
6  They asked me to take over the site, and I have text
7  messages from that customer.
8      Q.   Okay.  I'm going to request that you please
9  provide all of those text messages that you have to your
10  counsel and provide those to us.  Okay?
11     A.   Okay.
12     Q.   And it is your testimony today under oath that
13  you still have those text messages, correct?
14     A.   From Kevin, yes, him requesting since August
15  for me to provide him quotes from my newly formed
16  company.
17     Q.   Now, how did Kevin know that you had formed the
18  company?  You told him?
19     A.   Yes.  I told him and he was -- he was -- well,
20  let me rephrase that.  He asked me to start my company
21  because they were tired of Kilgore's pricing.  So
22  obviously, it took a while to form the LLC.
23     Q.   Okay.  So let's take this one step back.  So
24  Kevin -- and the company, you said, was Dresser-Rand, if
25  I'm not mistaken?

Page 24

```
 1        A.   Uh-huh.

 2        Q.   That was Kilgore clients, correct?

 3        A.   Uh-huh.

 4        Q.   Yes?

 5        A.   Yes.

 6        Q.   Okay.  And while you were employed at Kilgore,

 7   you're quoting a Kilgore client under RSC Mechanical,

 8   correct?

 9        A.   At the request of the customer, yes.

10        Q.   And you knew the pricing that Kilgore used,

11   correct?

12        A.   Yes.

13        Q.   And in that quote, taking advantage of knowing

14   the pricing for Kilgore, you quoted under Kilgore's

15   pricing, correct, for same services?

16        A.   Yes.

17        Q.   Did you obtain that job?

18        A.   No.

19        Q.   Why not?

20        A.   Because I was let go, and, apparently, somebody

21   at Dresser-Rand did not want me to do the job even

22   though Kevin was requesting it.

23        Q.   Okay.  Let's talk a little bit about all this.

24   What's Kevin's position at Dresser, or was?  I don't

25   know.
```

Page 25

1          A.   Well, when he was -- when he was there, he was

2     maintenance -- maintenance manager and some sort of

3     association with safety.

4          Q.   What is Kevin's last name?

5          A.   Kevin Midkiff (phonetic), Midkiff

6     (pronunciation).  Yeah, I don't know how to spell that.

7          Q.   And who told you that somebody at Dresser-Rand

8     did not want you working for them?

9          A.   I was let go.

10         Q.   Yes.

11         A.   When I was --

12         Q.   Who told you?

13         A.   My boss when I was let go.

14         Q.   And who are you referring to as your boss?

15         A.   Paul Therriault.  That was the reason why I was

16    let go, for that quote.

17         Q.   So let's talk about that.  So upon the time of

18    your termination at Kilgore, Kilgore told you that they

19    were terminating you because you had quoted a current

20    company employee on same services?

21         A.   Yes.

22         Q.   What was your response to that, if any?

23         A.   There was no response.

24         Q.   And you do admit that you quoted a Kilgore

25    client while still working for Kilgore under your own

Page 26

1     company and under a lower quote with regards to --
2     correct?
3          A.   I do, at the request of Kevin, yes.
4          Q.   Irrespective of whose request it was, you do
5     admit to having done that, right?
6          A.   Yes, at the request of the customer.
7          Q.   Would you agree with me that there's a conflict
8     in your actions if you're still working for Kilgore and
9     you're trying to obtain their same job from their same
10    clients using information from the company that you
11    know?
12         A.   No, because other Kilgore employees were doing
13    it and they were aware.  So at the time, I didn't think
14    it was a conflict.
15         Q.   Okay.  I'm going to break this response in
16    parts.  Let's forget about what others were doing.  My
17    question is simple.
18              Do you think your actions, as a Kilgore
19    employee and as the owner of RSC, in the first week of
20    October 2021, conflict when you were quoting a Kilgore
21    client under the pricing that you knew Kilgore was
22    giving them while you were working for both entities,
23    for Kilgore and for RSC?  Do you think there's a
24    conflict in that?
25         A.   No, because according to management, there was

Page 27

1   no conflict if they were allowing somebody else to do

2   it.  So I didn't think at the moment it was a conflict.

3        Q.   Prior to quoting Dresser, did you approach the

4   company and let them know that you were going to do

5   this?

6        A.   Did I approach who?

7        Q.   The company or your supervisor, Kilgore or the

8   supervisor, Paul, and let them --

9        A.   No, no.

10        Q.   So if there was no conflict, why wouldn't you

11   tell them beforehand that you were going to, quote, give

12   a better quote to Kilgore's client under your company?

13        A.   Because other -- other management people were

14   doing it higher than me.

15        Q.   Okay.  So let's talk about that because you've

16   repeated that three times.  What people -- what are the

17   names of these people that you're mentioning right now?

18        A.   Thanm Han (phonetic), who was the service

19   manager, who was the right-hand to my boss as far as the

20   service department.  Paul was aware.

21        Q.   Okay.  Anybody else, or would Thanm be the

22   person you're mentioning here?

23        A.   No.  That's the closest one I know.

24        Q.   Okay.  You say that's the closest one you know.

25   Is there anybody else you know that did this?

Page 28

```
 1        A.   There are others, but I don't know their names.
 2   They were in other departments.
 3        Q.   So with regards to Tom [sic], what was Tom's
 4   position?
 5        A.   Service manager.
 6        Q.   Okay.  And what was Tom's personal company?
 7   What was the name of it?
 8        A.   NDH.
 9        Q.   N, as in Nancy, D, as in dog, H?
10        A.   Yeah, Nancy David Henry.
11        Q.   And what was this company -- what would this
12   company do?
13        A.   HVAC.
14        Q.   Are you sure of that?  Are you a hundred
15   percent sure of that?
16        A.   Of what?
17        Q.   The fact that that company did HVAC.
18        A.   Yes, 100 percent sure.
19        Q.   And that company, NDH, went and quoted Kilgore
20   clients?
21        A.   Yes.
22        Q.   How do you know that?
23        A.   Because I've spoken to Thanm.
24        Q.   So you don't have personal knowledge of this.
25   You have knowledge because Tom told you?
```

Page 29

1          A.   I don't -- I don't have in my possession

2     pictures, but I was shown pictures and quotes.

3          Q.   Okay.  So you've spoken with Tom, correct?

4          A.   Uh-huh.

5          Q.   Verbal?

6          A.   Yes, yes.

7          Q.   And these conversations that you've had with

8     Tom, I'm assuming they happened while you were employed

9     at Kilgore, not after, correct?

10         A.   Yes.  They happened at Kilgore.

11         Q.   And excuse me.  What?

12              THE REPORTER:  I think he's frozen.

13              MS. ALFARO:  Yeah.  He's frozen on my end.

14         A.   You're breaking up.

15         Q.   (BY MS. ALFARO)  Yeah.  You're frozen on our

16    side.  Is that better?

17         A.   Yeah.  I can hear you now.

18         Q.   Okay.  So let's go back to my question.  My

19    question was if your conversations -- I'm assuming your

20    conversations with Tom happened while you were employed

21    at Kilgore.  Is that correct?

22         A.   Yes.

23         Q.   Have you had any conversations with Tom after

24    your employment with Kilgore ended?

25         A.   Yes, but it pertained to projects.

Page 30

1      Q.   Is Tom working at Kilgore?

2      A.   No.

3      Q.   Since when doesn't -- does Tom not work at

4  Kilgore?

5      A.   I think he left, my best recollection, July of

6  '20.  That's the best I can try to remember.

7      Q.   So Tom left Kilgore before you opened RSC?

8      A.   Yes.

9      Q.   Okay.  Why did Tom leave?

10     A.   To continue to pursue his own side, which

11  eventually turned into a full-time job.  So this had

12  been going on for a year, and it had gotten so heated

13  because he was trying to do his service manager duties

14  while still trying to grow his side company, and Paul

15  was aware.

16     Q.   What are the duties of a service manager at

17  Kilgore?

18     A.   To maintain communication between vice

19  president, the techs, dispatch, the projects,

20  salespeople, to try to coordinate all service work

21  projects.

22          And my frustration was I knew he was out

23  and about growing his company and was making the Kilgore

24  department struggle, so I voiced this many times with my

25  boss.  So I said, okay, so it's allowed then, I guess.

Page 31

1      Q.  So let me ask you this.  As a salesperson that

2   you've indicated that you were at Kilgore, you have

3   direct contact with the clients, correct?

4      A.  Yes.

5      Q.  Did Paul have direct contact with the clients?

6   Because he was a service manager, not a salesperson,

7   right?

8      A.  No.  Paul was the vice president.

9      Q.  So explain that to me again because you told me

10  he was a service manager.  What was Paul --

11     A.  No.  Thanm, T-h-a-n-m, Thanm.

12     Q.  Okay.  So Thanm and Tom are two different

13  people we're talking about?

14     A.  No.  It's the same one.  I'm talking about Paul

15  and Thanm.

16     Q.  Okay.  So Paul is the service manager?

17     A.  No.  Paul is the vice president.

18     Q.  Okay.  So going back to Thanm, going back to

19  the person that you've testified had his own company,

20  this person's position was what?

21     A.  Service manager.

22     Q.  As a service manager, did he have direct

23  contact with the client in his employment at Kilgore?

24     A.  Yes.

25     Q.  You doubted that.  You had to think about

Page 32

1    that.  Why?

2         A.  No.  It's because I thought you were asking

3    about Paul.

4         Q.  And, then, how does a service manager have

5    direct contact with the clients?  Because based on your

6    prior testimony, all he does is coordinate employees

7    within the company.

8         A.  No.  He would -- he mostly had direct contact

9    when there was an issue.  So he would have to step in

10   and -- on the technician's behalf.  So then he would get

11   direct contact.

12        Q.  And just to be clear, you never worked for

13   Thanm.  You never did work for Thanm's company, right?

14        A.  No.  I formed another company.

15        Q.  And any and all knowledge you claim to have

16   with regards to Thanm's own company was based on what

17   Thanm told you, correct?

18        A.  At -- yes, told me and showed me.

19        Q.  But you never had personal knowledge.  You

20   never saw his onsite work?  You never saw his clients

21   personally, right?

22        A.  I did.  He showed me quotes and pictures.

23        Q.  But again --

24        A.  From -- from --

25        Q.  Let me -- there's no question.  Give me one

Page 33

1    second.

2                Therefore, all the information you have

3    regarding Thanm's company was provided to you by Thanm?

4         A.   Yes.

5         Q.   Okay.  And, then, you testified that Thanm left

6    in July 2020, correct?

7         A.   Yes.

8         Q.   Okay.

9         A.   To the best of my knowledge.

10        Q.   Going back to your termination and your

11   testimony about the termination, let's talk a little bit

12   about the day of your termination.  When were you

13   terminated?

14        A.   October 26, 2020.

15        Q.   Okay.  And how did you learn of your

16   termination?

17        A.   I was called into the office by my boss.

18        Q.   And you've already told us that your boss was

19   Paul, right?

20        A.   Yes.

21        Q.   What is Paul's last name?

22        A.   Therriault.  T-h-e-r-r-i-a-u-l-t, I think.

23        Q.   What was Paul's position in the company?

24        A.   Vice president of the service department.

25        Q.   And let me ask you another question.  When were

Page 34

1    you hired by Kilgore?

2         A.   March 18, 2013.

3         Q.   What was your position upon hiring?

4         A.   Service sales.

5         Q.   At the time of your termination, was your

6    position the same as at the time of your hiring?

7         A.   No.  It kind of changed.

8         Q.   Okay.  How did it change?

9         A.   They realized my vast experience, so they

10   allowed me to project manage and estimate.

11        Q.   Let's go at it another way.  At the time of

12   your hiring, what was the title you had at the company?

13        A.   Service sales.

14        Q.   And at the time of your termination, what was

15   the title that you had at the company?

16        A.   I guess technically, it was still service

17   sales, but I did other duties.

18        Q.   Who hired you?

19        A.   Paul Therriault.

20        Q.   At any time during the hiring process, did you

21   let Paul know what your race was, or did he know?

22        A.   I'm pretty sure he knew.

23        Q.   Let's talk a little bit about hiring here.  So

24   were you interviewing for the position of service sales

25   at Kilgore?

Page 35

1        A.   Yes.

2        Q.   Okay.  And who interviewed you?

3        A.   Paul and Jeff Kilgore.

4        Q.   How many interviews, one?

5        A.   Yeah, just one.

6        Q.   How did you learn you were hired?

7        A.   I think he called me a week and a half later

8   after all background and drug tests was complete.

9        Q.   When you say he called you, would that be Paul?

10       A.   Paul, yes.

11       Q.   And throughout your employment at Kilgore since

12   hiring, was Paul always your supervisor?

13       A.   Yes, but sometimes ownership would interact

14   with me in some aspects because I was -- I was

15   different.  I did many, many projects that were not

16   really associated with just service.

17       Q.   Would you say -- would it be correct to say

18   that your direct report was Paul?

19       A.   Yes.

20       Q.   Okay.  And would it be correct to say that

21   throughout your entire employment in the company, your

22   direct report was Paul?

23       A.   Yes.

24       Q.   And you worked for this company for, give or

25   take, a little over seven years, right?

Page 36

1        A.   Yes.

2        Q.   And during these seven years, was your salary

3    raised?

4        A.   Yes.

5        Q.   You've already told me that they allowed you to

6    do more or had more duties than other people.  So I'm

7    assuming that's kind of a promotion, correct?

8        A.   No.  The other duties allowed me to be

9    incentivized more, not -- not actual salary increases or

10   nothing.

11       Q.   Okay.  So incentivized more means your ability

12   to earn more money?

13       A.   Yes.

14       Q.   So would you agree with me that a person that's

15   receiving raises and being incentivized more than other

16   people at the company is not being discriminated,

17   correct?

18       A.   No.  I performed more duties.

19       Q.   So that was -- performing more duties and

20   getting more pay was bad.  Is that what you're telling

21   me?

22       A.   No.  I'm saying that it has nothing to do with

23   discrimination.  I performed more duties.

24       Q.   And had ability to earn more money, correct?

25       A.   Yes, based off my talent.

Page 37

1    Q.   So that means that you were able to receive

2    better employment compensation, correct?

3    A.   Based on my duties, not --

4    Q.   So let me ask you this.  You had ability to

5    receive better compensation than other people in the

6    company.  Do you feel that was discriminating against

7    you?

8    A.   No, but --

9    Q.   Okay.  Going back to your -- this line of

10   questions started with the day of your termination, and

11   you told me you had been called by Paul into his office.

12   Do you recall that?

13   A.   Yes.

14   Q.   Okay.  Let's talk a little bit about that.  Who

15   was in the office?  Who was in Paul's office at the

16   time?

17   A.   Just me and him.

18   Q.   And was anybody nearby?

19   A.   Yes.  The dispatch people were right outside

20   his office.

21   Q.   And do you recall what specific dispatch people

22   those were?

23   A.   Lisa and Kelly and Paula and -- I forgot the

24   other lady's name.  I forgot her name.

25   Q.   Do you recall any of these people's last name?

Page 38

1     A.  I don't remember Lisa's last name.  I know it's

2  Kellye Templeman and Paula Seddon.

3     Q.  So they were not in the office, but they were

4  nearby when this conversation was happening?

5     A.  Yeah.  The dispatcher is right outside his

6  office.

7     Q.  Do you think dispatchers are able to listen to

8  what conversation is happening in the office?

9     A.  No, unless people get loud.

10     Q.  So I need for you to make your best effort in

11  recollecting, to the best of your ability, that

12  conversation.  Okay?

13         So who started the conversation?  Was it

14  Paul or was it you?

15     A.  Paul.

16     Q.  Okay.  What did he tell you?

17     A.  He asked who was RSC, and I said it's me.

18     Q.  And just to be clear, at this time, on

19  October 26, 2020, you'd never informed Paul or Kilgore

20  that you had formed RSC Mechanical?

21     A.  Yes.  I had informed them many times that I

22  might start RSC Mechanical because there were questions

23  that arose that he wanted to start -- he wanted to leave

24  as well.

25     Q.  Okay.  In your response, you said you informed

Page 39

1    him that you might start, correct?  That was your

2    testimony?

3         A.  Yes.  That had been conversation going on for

4    about two years.

5         Q.  Okay.  And you told me that in August 2020, you

6    formally opened up RSC Mechanical, correct?

7         A.  Uh-huh.

8         Q.  Yes?

9         A.  Yes.

10        Q.  And at no time after formally opening up

11   RSC Mechanical did you ever inform Paul that you had

12   actually opened this company?

13        A.  No.

14        Q.  And let's take this one step further.  Before

15   this conversation with Paul that's being held on

16   October 26, 2020, you never informed him that you were

17   quoting Kilgore clients via RSC Mechanical, correct?

18        A.  No.

19        Q.  Okay.  Going back to Paul's conversation with

20   you on October 26, 2020, you testified that he told

21   you -- he asked you who was RSC, and you responded it's

22   me.  What happened after that?

23        A.  He showed me the Dresser-Rand quote that was

24   given to him by -- not Kevin.  Apparently somebody in

25   Dresser-Rand management.

Page 40

1          So apparently Kevin was trying to set me up

2     as a new vendor, and then management, I guess, became

3     aware.  But again, it was at the request of Kevin, who

4     is a Dresser employee.

5          Q.  So based on this testimony, would you say it's

6     correct to say that apparently somebody at Dresser

7     didn't like the fact that a Kilgore employee was quoting

8     under another name?

9          A.  Yes.

10         Q.  Do you see any impropriety in that action?

11         A.  No.

12         Q.  So once Paul presents to you with RSC quotes to

13    Dresser, what happened?

14         A.  Said I'm going to have to let you go.  I said

15    okay.

16         Q.  Was that the only response you gave him, okay?

17         A.  No.  We obviously talked about the money that

18    they owed me, commission -- I don't know -- hundreds of

19    thousands of dollars.  And he said he was going to

20    finish the report and present it to ownership and then I

21    might need to get a lawyer to get my money.

22         Q.  Okay.  Let's talk in detail about that

23    conversation.  And again, I'm going to request that you

24    do the best that you can and give me the exact words

25    each party was saying at the time.

Page 41

1          So Paul told -- this is what you've

2    testified so far.  Paul told you that he was going to

3    have to let you go, and you said okay.  What happened

4    after that, to the best of your recollection?

5          A.  Yeah.  We talked about specific projects.

6    Actually, in the moment of my letting go, the -- when I

7    said D.E. Harvey, I was actually getting the PO for

8    D.E. Harvey.  They were dinging on my phone.

9          So as I handed him the phone and the

10   laptop, I said, well, I'm going to want commission on

11   this one because this one was correlated -- awarded to

12   me specifically for me.  Okay?  D.E. Harvey did not want

13   to do work with Kilgore.  They wanted to do work with

14   Rudy Carmona through Halliburton.  The relationship had

15   nothing to do with Kilgore.  D.E. Harvey was -- asked to

16   work with Rudy Carmona.

17         So this was specific.  I asked all the

18   other projects, the Dresser projects, the FMC projects.

19   He said, well, the best I can do is write the report and

20   present it to ownership.  So it went on into what am I

21   owed and I need my money, and that's what -- the

22   direction the conversation went into.

23         Q.  Okay.  Did you request a specific amount of

24   money to Paul at the time?

25         A.  No, because I was waiting for his report, but I

Page 42

1    had an assumption based off what I knew my profit

2    margins were.

3         Q.   Okay.

4         A.   But there was at least 10 large and about 20

5    small projects, because we get paid on projects, T&M,

6    which is time and material, and service work.

7         Q.   Okay.  Let's break your response down.  At the

8    time of your termination, talk to me about your

9    compensation package.  Was there a component -- a salary

10   component?

11        A.   Yes.  There's a draw that's covered by my

12   ability to perform.

13        Q.   Okay.  And that draw -- and what was that draw?

14   Was it per month, per week?

15        A.   Per week.  We got paid weekly.

16        Q.   And at the time of your termination, what was

17   your draw?

18        A.   So it had got increased to a hundred thousand,

19   so I don't know the math right now.  I think it was 19,

20   1900 a week, something like that.  I don't know.  Before

21   taxes.

22        Q.   So when you say you were increased to a hundred

23   thousand, that would have been a hundred thousand yearly

24   salary is your testimony?

25        A.   Yes.  What's funny is they were trying to pull

Page 43

1    it back.  They awarded it right before the Corona.  Then

2    they tried to pull it back, but then I got awarded all

3    these large projects and --

4          Q.  So it was never pulled back?

5          A.  No.

6          Q.  Okay.

7          A.  Because I was performing exceptionally well

8    during the Corona.

9          Q.  So when you talk about a draw -- and correct me

10   if I'm wrong -- that means that you get a weekly amount,

11   and based on your performance, if you don't get to that

12   amount, that could be reduced?

13         A.  No.  The reduction was because Kilgore was

14   struggling financially during the Corona.  So all major

15   management and high salary people were going to be asked

16   to be reduced, and there was reduction.  There was waves

17   of reduction, but I was performing well and I had just

18   signed the FMC project, and I said, you can't reduce it,

19   I just got this award.  Or, obviously, I made my

20   threats, I'll go somewhere else and take all my clients

21   with me.

22         Q.  Was that typical, your typical way of working?

23   Would you repeatedly threaten Kilgore with leaving?

24         A.  I was -- yes.  When I was repeatedly harassed

25   and treated bad, yes.  It was typical for me to -- to

Page 44

1   get my statement and not get paid on my bonuses for

2   weeks and months while others who had smaller incentives

3   would get paid quicker, but mine were held up.

4            So I was the highest performing guy, but I

5   was treated worse.  And I was constantly harassed by my

6   boss as to I'm going to make more than him this year.

7        Q.  Okay.  Let's break this testimony down.  First

8   and foremost, we started talking about your draw and the

9   composition of your compensation at Kilgore at the time

10  of your termination.  Besides the draw, were there any

11  bonuses, incentives or other benefits?

12       A.  The incentives were just based on the

13  performance of the jobs.

14       Q.  Can you repeat that again, please?

15       A.  The incentives were based off the performances

16  of the jobs.

17       Q.  Okay.  And what were those incentives?

18       A.  They were bonuses or commissions based on the

19  jobs, based on how profitable.

20       Q.  How would those commissions be distributed?

21       A.  He would run a report monthly.

22       Q.  Okay.  So who runs a report?

23       A.  Paul.

24       Q.  And he runs a report on what?

25       A.  On the -- on the sales that we perform on.

Page 45

1    Again, projects, T&M and service, and it was always a

2    constant battle.

3         Q.   So Paul runs a monthly report on the sales of

4    projects, TM and service that, for example, you made for

5    Kilgore that month?  Yes?

6         A.   Yes, yes.

7         Q.   Okay.  And you don't get paid on the entirety

8    of the sales that Kilgore makes, correct?

9         A.   No.  I get a percentage based off the sales

10   plan.

11        Q.   Okay.  So let's talk about that sales plan.  At

12   the time of your termination, do you recall what your

13   sales plan was?

14        A.   Yes.  It was 20 percent of net after overhead

15   cost, which had changed because of me.

16        Q.   Okay.  Are we a hundred percent -- are you a

17   hundred percent sure that your commission was -- the

18   commission you would be entitled at Kilgore was 20

19   percent net sales after overhead costs?

20        A.   Yes.

21        Q.   So whatever sales you made for the company,

22   Paul would run a report, and that amount, you would

23   receive incentives or bonuses for 20 percent net after

24   overhead costs.  Is that your testimony?

25        A.   Yes.

Page 46

```
 1        Q.  Now, let me ask you this.  Is that compensation
 2   plan in writing somewhere?
 3        A.  Yes.
 4        Q.  Where?
 5        A.  It was presented by email, an actual like --
 6        Q.  Presented to you?
 7        A.  Yes.  It was given to all the salespeople.  The
 8   plan had -- in seven years, had changed three times
 9   because of me, because I was making, quote/unquote, too
10   much money.  And again, I was told directly by -- that
11   by ownership after a meeting because the sales plan was
12   changed.  I was told by Jeff Kilgore, I can't pay a
13   sales guy 300,000, to make more than vice presidents.
14        Q.  At the time of your termination -- I want to be
15   clear because you've said that this has changed.  At the
16   time of your termination, your sales plan was 20 percent
17   net after overhead costs for any sales that you made?
18        A.  Yes.
19        Q.  Okay.  Besides the draw and besides the sales
20   plan that you've indicated, any other components of your
21   compensation at Kilgore?
22        A.  Yes, truck allowance.
23        Q.  What was your truck allowance?
24        A.  Five hundred a month.
25        Q.  And would those three components be all for
```

Page 47

1    your compensation at Kilgore?

2         A.  Yes.

3         Q.  At the time of your termination where you're

4    having these conversations -- this conversation with

5    Paul, you said that you had in -- I think the word you

6    used was an estimation.  So in your head, you had a

7    figure that you thought you were owed by the company.

8    Would that be a correct statement?

9         A.  Yes.

10        Q.  Okay.  And what would that figure be?

11        A.  I would honestly estimate about 160.

12        Q.  A hundred and sixteen, one six --

13        A.  No, a hundred and six zero, 160.

14        Q.  One six zero, zero, zero, zero?

15        A.  Yeah.

16        Q.  Okay.  So at the time of your termination, you

17   estimated that you were owed this amount by Kilgore,

18   correct?

19        A.  Yes.

20        Q.  Okay.  In this estimate that you did, did you

21   run it, reconcile it through any documents, papers with

22   your sales work, or this was something that you got off

23   the top of your head?

24        A.  No.  It's based off what I knew, projects that

25   had been closed, projects that were about to close, for

Page 48

1    instance, the FMC, some of the Dresser projects, some of

2    the Halliburtons that were already -- they were done.

3    So my recollection of what the profits were for those

4    was understood.

5              It was the large other one that was done

6    for Halliburton right as I was getting released, the

7    large $1.2 million project for Halliburton through

8    Harvey.  That one, I did not know how it performed

9    because I -- as I was getting let go, I was getting the

10   POs.

11        Q.  So when you talk about this estimate, you're

12   considering -- I mean, you have in your head what the

13   overhead costs were, what the original cost of the

14   project was --

15        A.  Yes.

16        Q.  -- and you're doing the math in your head?

17        A.  Yes, yes.

18        Q.  And to this day -- today, not during your

19   termination -- what amount do you believe that Kilgore

20   owes you?

21        A.  A million dollars.  I have -- I have -- during

22   the stress that Paul Kilgore caused me, I developed

23   Bell's palsy.  I got Bell's palsy in December of '18 due

24   to the fact of the high stress levels, high harassment

25   created by Paul.

Page 49

1       For -- prior to my termination, the last
2  four years, there was a battle every December because he
3  would want to push my last December bonus into January
4  to not affect the department's financial statements so
5  that he can get a bonus, but because of how these
6  projects worked, they would stack up.  And each
7  December, I was always owed the largest bonus in the
8  department, and they ranged from 30- to 60,000.  And he
9  would beg me -- he would beg me to push them into
10  January.
11       Q.  How did you know that your bonus in the company
12  was the largest?  Did you ever see a spreadsheet about
13  what everybody's compensation was?
14       A.  No.  He would tell me.
15       Q.  So your knowledge and your testimony today is
16  that you had the largest bonus because you claim Paul
17  told you?
18       A.  Paul told me and Jeff.  Jeff would -- they
19  would sign the checks.
20       Q.  Did Jeff ever tell you that your bonuses were
21  the largest in the company?
22       A.  No, but he told me he didn't want to pay me
23  300,000.
24       Q.  Going back to my question, did Jeff ever tell
25  you that you were the person receiving the largest bonus

Page 50

1    in the company?

2        A.   Not in the department, not in the company.

3    There's other departments that make more than the

4    service department.

5        Q.   Did Jeff ever tell you that you were the person

6    in your department receiving the highest bonus?

7        A.   Yes.

8        Q.   Let's go back to your testimony.  You said that

9    you developed Bell's palsy on or around December 2018,

10   correct?

11       A.   Yes.

12       Q.   Okay.  Do you know what workers' compensation

13   is?

14       A.   Workmen's comp?

15       Q.   Yes.  Do you know what that is?

16       A.   Yes.

17       Q.   Okay.  In December 2018 and all the way through

18   October 26, 2020, you worked for Kilgore, correct?

19       A.   Yes.

20       Q.   At any point from December 2018 to October 26,

21   2020, did you ever request workers' compensation?

22       A.   No.

23       Q.   Yet your testimony today is that you've

24   developed a condition based on work, on a work-related

25   matter, correct?

Page 51

1         A.   Yes.

2         Q.   Let's talk a little bit about Bell's palsy.

3    Did you tell anybody at the company, on or around

4    December 2018 or anytime thereafter, that you had been

5    diagnosed with this?

6         A.   Yes, the doctors at St. Luke's.

7         Q.   Doctors at St. Luke's diagnosed you, correct?

8         A.   Yes, yes.

9         Q.   Okay.  Now, my question is different.  My

10   question is, on or around the time you're diagnosed or

11   anytime thereafter while you worked for Kilgore, did you

12   ever tell anybody in the company that you had been

13   diagnosed with this?

14        A.   Yes, HR and Paul.  And, of course, everybody in

15   the company could see me, and --

16        Q.   Okay.

17        A.   -- we had Christmas parties, so ownership was

18   aware.

19        Q.   So when did you tell HR?

20        A.   When me and Paul had a dispute and we had to

21   get HR involved, so HR was aware.

22        Q.   When was this?

23        A.   Two or three days after I got it because we --

24        Q.   Two or three days after what?

25        A.   After I got Bell's palsy.

Page 52

1      Q.   Two or three -- so we're talking December 2018?

2      A.   Yes.

3      Q.   Okay.  And who in HR did you tell specifically?

4      A.   The HR director.

5      Q.   And what is his name?

6      A.   I forgot.  It was a she.  I don't remember her

7   name.  She was only there for, like, six months, so I

8   don't remember her name.

9      Q.   And you specifically told her you had Bell's

10  palsy?

11     A.   Yes.

12     Q.   And you told her for what reason?

13     A.   I told her I had Bell's palsy because we -- me

14  and my supervisor were in a disagreement over my

15  commission.  And we had got in a heated discussion, so

16  we had to involve HR.

17          And the discussion went as to I have to be

18  aware of other people's feelings because we don't know

19  what they're going through, and I told her I don't care

20  what Paul's going through, I have Bell's palsy.  So his

21  feelings of how he's having his morning go are

22  irrelevant because I need my money that I've earned.

23          So we had to have a discussion with HR.  So

24  as you can tell, we had to involve HR over my money.

25     Q.   Well, let's talk about that.  HR was involved

Page 53

1   because of how you were addressing the situation with

2   another company employee, correct?

3       A.  Yes, and HR realized that I was right.

4       Q.  And why did this scale to HR?  Were you talking

5   or conducting yourself in an inappropriate manner?

6       A.  No.

7       Q.  So the question still remains -- let's take it

8   one step at a time.  The question still remains, why was

9   the situation escalated to HR?

10      A.  Because I -- I requested HR.

11      Q.  And at the same time you're telling HR, I

12  assume your testimony would be you were telling Paul,

13  correct, about the Bell's palsy?

14      A.  Paul was in the room with HR.

15      Q.  So that's the first time Paul learns about your

16  diagnosis?

17      A.  No.  He knew -- he knew the date -- the day

18  I -- I got it on a Saturday.  I came to work Monday.  We

19  didn't have the meeting with HR till, like, Thursday or

20  Friday.

21      Q.  What did you tell Paul?

22      A.  I have Bell's palsy.

23      Q.  You told him on a Monday?

24      A.  Yes.

25      Q.  What was his response?

Page 54

1      A.   I should go to a doctor, and the doctor

2  diagnosed it that Monday, St. Luke's.

3      Q.   Okay.  So let me get this straight.  Had you

4  been diagnosed prior to telling Paul, or did you get

5  diagnosed and then tell Paul?

6      A.   No.  Paul was aware Monday.  It was assumed it

7  was Bell's palsy or a stroke.  I got diagnosed Monday.

8  We had the HR meeting Thursday or Friday, and then they

9  were both well aware it was a proper diagnosis Thursday

10  and Friday.

11      Q.   Okay.  Let us go back on some testimony you've

12  provided previously to get all this straight.  All of

13  this testimony has been provided because you told me

14  that you estimated that the company owes you a million

15  dollars, and you started talking about Bell's palsy.

16          Forgetting about damages and exclusively

17  talking about compensation, what is your claim that the

18  company currently owes you -- and when I say the

19  company, I mean Kilgore -- with regards to owed

20  compensation?

21      A.   With no Bell's palsy, without the damages?

22      Q.   Right.

23      A.   Yeah.  I believe they owe me the 160, plus any

24  lawyer fees associated with this and --

25      Q.   Let's talk about that for a minute.  Have you

Page 55

```
1    paid any lawyer fees up-to-date with regards to this

2    case?

3          A.  Yes, to Kennard Law.

4          Q.  Okay.  How much?

5          A.  16,000, I think, yeah.  It's been --

6          Q.  Would that be a thousand six hundred or

7    $16,000?

8          A.  $16,000.

9          Q.  And those $16,000 that you paid, was that a

10   retainer fee?

11         A.  It was in different stages.  I don't know if

12   it's -- I think the first was 5,000.

13         Q.  You've talked about 5,000.  You've talked about

14   16,000.  I just want to make sure, the total that you've

15   paid to your lawyers up-to-date is 16, one six,

16   thousand?

17         A.  Yes.

18         Q.  Do you know if your lawyers are contracted on a

19   per-hour basis or on a contingency fee basis?

20         A.  It's not a per hour.  I don't know what the

21   other part is, contingency.

22         Q.  Do your attorneys get a percentage of what you

23   get, if anything, in this case?

24         A.  Yes.

25         Q.  Do you know if that percentage is 40 percent?
```

Page 56

1      A.   It's been two years or -- I don't know if it's

2   35 or 40.  I don't remember.

3      Q.   Okay.  Now, you also testified that Paul

4   would -- the word you used was harass you with regards

5   to your bonus, correct?

6      A.   Yes.

7      Q.   Okay.  Did you ever complain about Paul

8   harassing you at the company?

9      A.   Yes.  That's one of the reasons why we had that

10  meeting.  I specifically asked to meet with him that

11  day.  The conversation got heated because I was asking

12  for my statement to be presented.  It had been weeks.

13            He said, I don't have time.  He started to

14  yell, started to threaten to let me go.  I said, well,

15  you know what, let's just get HR involved.

16            So, then, his argument to HR was that I

17  stormed his door, and, then, once we got in front of HR,

18  I said no, no, do you remember that I asked you in the

19  hallway if you had a minute, and then he remembered.

20     Q.   During this conversation, did you specifically

21  tell HR, the lady that you don't remember the name, that

22  Paul was harassing you?

23     A.   Yes.  It was over -- it was over the fact of my

24  statement, that he was constantly withholding my

25  statement.

Page 57

1      Q.   Okay.  But let's be clear here.  One thing is

2  to tell HR that he's withholding your statement, and

3  another is to tell HR that he's harassing you.

4            During this conversation with HR, I

5  understand that you told them that he was withholding

6  your statement, correct?

7      A.   Yes.  So that's why she quit, because Kilgore

8  would not do nothing when things were presented to HR.

9      Q.   That was not a question, but --

10     A.   Yes.

11     Q.   -- we'll go there.  Let's take it step-by-step.

12           My next question would be, did you ever

13 specifically tell HR that Paul was harassing you, using

14 that word?

15     A.   Yes.

16     Q.   Okay.  When did you tell HR that Paul was

17 harassing you?

18     A.   After Paul left the room.

19     Q.   And you specifically used that word?

20     A.   Yes.

21     Q.   Okay.  And who did you say this to?

22     A.   That HR lady.

23     Q.   And what was her response, if any?

24     A.   That she was going to try to address it with

25 ownership.  That's why she lasted six months, because

Page 58

1   ownership will not do nothing because ownership is
2   corrupt.
3        Q.   Do you know when this HR lady that you don't
4   recall her name left?
5        A.   She only lasted six months, so I would recall
6   June of '19.  She had just -- she had just been there,
7   like, a month before this incident.
8        Q.   So at the time that this lady from HR, who you
9   do not recall her name, left, did she provide you the
10  reasons for leaving?
11       A.   No.
12       Q.   Did anybody in the company come to you and show
13  you her termination documents?
14       A.   No.
15       Q.   Okay.  So you can only assume the reasons as to
16  why she left, correct?
17       A.   Yeah.  There were just rumors about -- there
18  were many -- and that's just mine -- many, many other
19  associated HR violations that she would try to take to
20  ownership.  So it was -- it was the wild west.
21       Q.   So all of these rumors and all that, you have
22  no personal knowledge about those, correct?
23       A.   No.
24       Q.   And you have no personal knowledge as to the
25  reasons why this HR lady, who you don't remember her

Page 59

1  name, left, correct?

2      A.  Correct.

3      Q.  Now, you stated that ownership is corrupt.

4  Those were your words, correct?

5      A.  Yes.

6      Q.  Okay.  Those are strong words, and I remind you

7  that you are under oath.  Why do you say that ownership

8  is corrupt, and who do you refer to as ownership?

9      A.  Jeff and Ken Kilgore.

10     Q.  And your sworn testimony that they are corrupt

11 are based on what?

12     A.  I demanded a meeting in '16, one of the

13 second -- or first or second time the sales plan

14 changed, and it was me, my boss and the two owners.  And

15 I was told to my face that they would never be able to

16 pay a salesman 300,000.

17         So rather than incentivize a guy that is

18 highly performing, they are changing the sales plan to

19 benefit their pockets rather than how I performed.  I

20 call that corruption.

21     Q.  What is your definition of corruption?

22     A.  Stealing money.  So I think they stole my

23 money.  We had a sales plan in place that was in

24 writing, and they chose to change the plan.

25     Q.  So this was back in 2016, you stated, right?

Page 60

1        A.   Yes.

2        Q.   And you state in your testimony here today, not

3    mine, that they stole money from you, Jeff and Ken.  Did

4    you do anything about them stealing your money, based on

5    your testimony?

6        A.   No.

7        Q.   Why not?

8        A.   I probably should have got a lawyer.

9        Q.   That's not my question.  My question is, if

10   they stole money from you, why not do something about

11   it?

12       A.   I'm doing something about it now.

13       Q.   Okay.  Going back to your original question,

14   which was the termination meeting, so how did that

15   meeting end with Paul?  What happened at the end of the

16   meeting?

17       A.   I just -- I gathered my few things in my desk,

18   and then we walked outside and I went on my way.

19       Q.   At any point in time during this termination

20   meeting with Paul, did you tell him that Thanm was doing

21   this as well?

22       A.   No.  He -- we had prior conversations to this,

23   many conversations to this.  In fact, I threatened to go

24   to ownership because I was tired of it.

25       Q.   So at any time during this conversation with

Page 61

1    Paul during your termination meeting, did you tell him
2    that he was discriminating against you?
3         A.   No.   I don't think I did.
4         Q.   Once you left Kilgore on October 26, 2020, what
5    did you do with regards to work and income?
6         A.   Well, I already had income from my windshield
7    business, but then I started to try to reach out to new
8    clients, try to build my company.
9         Q.   And those clients that you were reaching out
10   to, were they Kilgore clients?
11        A.   Some yes and some no.
12        Q.   Okay.   Which one of those that you reached out
13   to were Kilgore clients?
14        A.   Obviously, FMC, and again, Halliburton was
15   aware the moment I am.   So they were one of the ones.   I
16   did not reach out to them.   They reached out to me.   So
17   the conversation began because of the D.E. Harvey PO.
18   Brookfield.
19        Q.   Who else?
20        A.   Those are the only Kilgore clients.
21        Q.   So you talked about your windshield business.
22   So let me ask you this.   Is Kilgore aware that you also
23   had a windshield business going on?
24        A.   Yes.
25        Q.   And they never had any issues with the

Page 62

1    windshield business, correct?

2         A.   No.   I actually did Kilgore windshields.

3         Q.   And as a matter of fact, your job at Kilgore

4    had nothing to do with windshields, right?

5         A.   No.   That's where I was -- I was actually doing

6    Kilgore windshields.

7         Q.   Because a job that didn't conflict directly

8    with the job that you performed at Kilgore was okay to

9    do, not one that conflicted directly, correct?

10        A.   Yes.   They were aware from the moment of the

11   interview.  Jeff and Paul asked me, and I said I have a

12   windshield business.  So they were aware from day one.

13             MS. ALFARO:  Why don't we take a break.  It

14   is currently 10:08.  Let's come back at 10:20.

15             THE WITNESS:  Okay.

16             (A recess was taken.)

17             THE REPORTER:  Go ahead.

18             MS. ALFARO:  Thank you.

19        Q.  (BY MS. ALFARO)  Mr. Carmona, before we

20   continue, I just want to remind you that you are under

21   the same oath as this morning.  Okay?

22        A.   Okay.

23        Q.   I'm going to go into some questions now.  What

24   is your highest educational degree obtained?

25        A.   I have an occupational certificate from

Page 63

1    San Jac for HVAC.

2         Q.   What year?

3         A.   I think it was 2002.  I think so, yeah.

4         Q.   And prior to that, you graduated from high

5    school?

6         A.   Yes.

7         Q.   From where?

8         A.   Stephen F. Austin High School.

9         Q.   What year?

10        A.   Oh, '99.

11        Q.   Do you have any other certifications or

12   anything else?

13        A.   Just my EPA license, my state contractor's

14   license for HVAC.

15        Q.   And are those active and in good standing?

16        A.   Yes.

17        Q.   Let's talk a little bit about your employment

18   history prior to Kilgore.  Prior to Kilgore, where were

19   you employed?

20        A.   Before Kilgore, I was at Coopwood's air

21   conditioning.

22        Q.   You worked there from when to when?

23        A.   June -- April of '10 to March of '13.

24        Q.   So you worked there three years?

25        A.   Yes.

Page 64

1      Q.   And what was your position there?

2      A.   I was a chiller, service tech.

3      Q.   And why did your employment there finalize?

4      A.   Because I got the position at Kilgore.

5      Q.   So while working there, you were applying for

6  another position?

7      A.   Yes.

8      Q.   And why did you want to move?

9      A.   I wanted to get out of the field.

10      Q.   Your last day in Kilgore was October 26, 2020,

11  as you've stated.  So throughout the entire 2021, you

12  worked under your windshield and RSC business, right?

13      A.   Repeat that.  I'm sorry.

14      Q.   So for 2021, your sources of income were your

15  windshield business and RSC, correct?

16      A.   Yes.

17      Q.   Any other source of income during 2021?

18      A.   Not mine.  My wife has a -- she also works, but

19  it's not mine.

20      Q.   So what was your income in total for 2021?

21      A.   Gross or net?

22      Q.   Either.

23      A.   I think net, I would say -- I would say 600.

24      Q.   $600 or 600,000?

25      A.   600,000.

Page 65

1          Q.   Okay.   And so you would say you're making more

2     on your own than with Kilgore?

3          A.   Yes.

4          Q.   Have you filed your tax returns for 2022?

5          A.   No.

6          Q.   Are you planning on filing them?

7          A.   Yes.

8          Q.   And again, to be clear, other than from these

9     two businesses, there's no other source of income for

10    you for 2021 on these net profits?

11         A.   No.

12         Q.   Now, have you been terminated from any other

13    employment other than Kilgore?

14         A.   Yes.

15         Q.   Okay.   From where?

16         A.   Project Lighting in 2000.   2000, I think.

17         Q.   Is that the name of the company, Project

18    Lighting?

19         A.   Yes.

20         Q.   Where is that company located?

21         A.   In Houston.   I just don't know if they're --

22    they may still be in business.

23         Q.   And why did they terminate you?

24         A.   They said -- they claimed insubordination.

25    And, then, I obviously filed a discrimination, and then

Page 66

1    I was awarded.

2         Q.   You were awarded what?

3         A.   I was awarded -- we settled for a small lump

4    sum for them being discriminating against me through --

5    I filed with the EEOC.

6         Q.   So this is not your first rodeo with regards to

7    making a claim against an employer?

8         A.   Yes.

9         Q.   Okay.  At that time, then, you filed an EEOC

10   charge, you said?

11        A.   Yes.

12        Q.   What year was that?

13        A.   2000.

14        Q.   And you were claiming what type of

15   discrimination?

16        A.   Racial.

17        Q.   And how did that company discriminate against

18   you?

19        A.   They were racist.

20        Q.   What does that mean?

21        A.   They called me a wetback.

22        Q.   Was it your claim against Project Lighting that

23   they terminated you also because they discriminated

24   against you, just like in this case?

25        A.   That they did -- yeah, they terminated me

Page 67

1    because they discriminated against me, yes.

2         Q.  So it's the same as what you're claiming in

3    this case, with a different set of facts?

4         A.  Yes.

5         Q.  Any other employer that you've filed a claim

6    against or sued?

7         A.  Yes.  I had filed a claim against Petrochem

8    also, but then I just -- I didn't -- I let it go.

9         Q.  Okay.  Let's talk a little bit about that.  You

10   said Petrochem?

11        A.  Yes.

12        Q.  You worked for them?

13        A.  Yes.

14        Q.  When did you work for Petrochem?

15        A.  April of '04 to -- I'm trying to think.  July

16   of '09, I think.

17        Q.  So you worked for Petrochem before working

18   for Coopwood's?

19        A.  Yes.

20        Q.  And what was your position there?

21        A.  Also junior service tech, service tech.

22        Q.  Where is Petrochem located?

23        A.  La Porte.

24        Q.  Who was your supervisor there?

25        A.  There was many supervisors in five years.  Mike

Page 68

1   Bryant, Mike Woolhoff (phonetic), Troy -- Troy and Ricky

2   Tankersley.

3        Q.  And were you terminated from Petrochem?

4        A.  Was I terminated from Petrochem?

5        Q.  Yes.

6        A.  No.

7        Q.  How did your employment with them end?

8        A.  I went to Star Services.  I left.

9        Q.  You resigned?

10       A.  Yes.

11       Q.  Okay.  And what is Star Services?

12       A.  Another air conditioning company.

13       Q.  And what is it that you claimed against

14  Petrochem?

15       A.  They were also racist.

16       Q.  Why were they racist?

17       A.  Because they treated me, as the only Hispanic,

18  very badly, and there was racist comments made around me

19  and how they regarded Hispanics.

20       Q.  So what did you do?  Did you file an EEOC

21  complaint against Petrochem?

22       A.  Yes.

23       Q.  And you withdrew it?

24       A.  Yes.  I didn't withdraw it.  I just didn't

25  continue to pursue it.

Page 69

1        Q.  Why not?

2        A.  At the time, I was starting a new job, and I

3  had a newborn on the way, and there was just enormous

4  amounts of stress.

5        Q.  Can we go back a minute to Project Lighting?

6  You said that you settled with them.  How much did you

7  settle for?

8        A.  I think it was like 5,000 bucks.

9        Q.  About what?

10       A.  $5,000.

11       Q.  Were you represented by counsel then?

12       A.  No.

13       Q.  How about in the claim -- the EEOC charge of

14  discrimination that you made against Petrochem?

15       A.  No, no legal counsel.

16       Q.  Any other claims, demands or complaints or

17  petitions or lawsuits filed against any other employers?

18       A.  No.

19       Q.  So since what year have you been working?

20       A.  Since -- since I was in high school in 1998.

21       Q.  And since that time, you've made these three

22  discrimination complaints, if we count the one that

23  you're now making against Kilgore, correct?

24       A.  Yes.

25       Q.  And they're all based on race discrimination?

Page 70

1      A.   Yes.

2      Q.   Other than making claims, lawsuits or charges

3  against employers, have you ever been a plaintiff or a

4  defendant in any other lawsuit?

5      A.   No.

6      Q.   Any class action?

7      A.   No.  Wait a minute.  Yeah, the BP -- BP Benzene

8  in 2010.

9      Q.   Tell me about that.  What happened there?

10     A.   So Benzene -- BP released Benzene for 40 days.

11 So every -- everybody in the plant and a five-mile

12 radius around the plant was allowed to participate in

13 the class action suit against BP.

14     Q.   And you opted to participate, correct?

15     A.   Yeah.  I got rained on Benzene for 40 days.

16     Q.   And how much did you earn from that class

17 action?

18     A.   $20.  I guess they settled.  I have my opinion.

19     Q.   You're certainly experienced in suits and legal

20 charges, correct?

21     A.   Oh, I learned to stand up for myself.

22     Q.   That was not my question.  I mean, there's at

23 least four claims, lawsuits or charges, so I think it

24 would be reasonable to say that you're experienced in

25 making claims, correct?

2

Page 71

1            MR. HODGES:  Objection, form.
2       Q.  (BY MS. ALFARO)  Go ahead.  You can answer,
3  Mr. Carmona.
4       A.  That I'm quite experienced?
5       Q.  I said that you're experienced.
6       A.  I've had experiences, yes.
7       Q.  Okay.
8       A.  I can't see you no more.  Is it my internet?
9            THE REPORTER:  I can't see her either.
10            MS. ALFARO:  Oh, I'm sorry.  I'm sorry.  My
11  bad.  There we go.  My apologies.
12       Q.  (BY MS. ALFARO)  Okay.  A while back -- and I
13  just want to make sure we have this clear.  With regards
14  to compensation, meaning salary, et cetera, and
15  everything else, you said that you estimated that the
16  company owes you about $160,000.  Do you remember that?
17       A.  Yes.
18       Q.  Okay.  The complaint filed by your attorneys in
19  this case -- you're aware that your attorneys filed a
20  complaint in this case in court on your behalf, correct?
21            MS. ALFARO:  Is he frozen?
22            THE REPORTER:  I think so.
23            MS. ALFARO:  Mr. Carmona?
24            THE REPORTER:  Do you want to go off till
25  we get him back?  There we go.

Page 72

1          THE WITNESS:  Hello.

2     Q.  (BY MS. ALFARO)  Hello.  Can you hear us?

3     A.  Yeah.  I can hear you now.  It was very choppy,

4  freezing up.

5     Q.  Yeah.  You were frozen on our end, so I'm going

6  to repeat the question.

7          Do you recall when you said to me that you

8  estimated that the Kilgore company owes you about

9  $160,000 with regards to monetary compensation, correct?

10    A.  Yes.

11    Q.  Okay.  Would that be the entirety of what they

12  owe you with regards to any salary, bonuses, benefits or

13  compensation, company compensation, employment

14  compensation?

15    A.  Yeah.  Just in regards to company compensation,

16  yes.

17    Q.  Okay.  Now, before we start on another topic, I

18  wanted to ask you, once you were terminated from

19  Kilgore, did you request unemployment benefits?

20    A.  Are you talking about unemployment?

21    Q.  Yes, sir.

22    A.  No, no.

23    Q.  Going back to the question before you froze,

24  are you aware that your attorneys in this case filed a

25  complaint in court on your behalf against Kilgore?

Page 73

1          A.   Yes.

2          Q.   Okay.  Have you read that complaint?

3          A.   Not in full, yes, but I have read it.

4          Q.   Are you in agreement with what you've read

5     about that complaint?

6          A.   Yes.

7          Q.   Why have you not read it in full?

8          A.   I mean, I skimmed through it, the

9     discrimination stuff and the wages stuff and loss of

10    pain and suffering with regards to my Bell's palsy, and

11    it was a long document.  I just highlight -- I just read

12    over the important stuff.

13         Q.   Okay.  So let me ask you this.  With regards to

14    what your attorneys claim you are owed in compensation

15    in that complaint, are you in agreement with that?

16         A.   Yes.

17         Q.   Your complaint says -- when it was filed by

18    your attorney, says that you were -- you estimate being

19    owed a hundred thousand dollars.  So is that correct?

20         A.   No.  It's 160.

21         Q.   So would you say that the complaint your

22    attorneys filed is incorrect?

23         A.   I think it was just estimated.

24         Q.   And how did that estimate change from the time

25    the complaint was filed, from after your termination to

Page 74

1    today, for over $60,000, for about $60,000?

2         A.   I don't know how it got estimated, but again,

3    I'm estimating what they owe me in a project that I did

4    not see the revenue, which is the lab project for

5    Halliburton.

6         Q.   Let me get this clear.  Is a hundred thousand

7    incorrect or your 160 incorrect?

8         A.   A hundred thousand is incorrect.

9         Q.   Okay.  So let's talk about your claim.  So

10   you're aware that you've made discrimination and

11   retaliation claims against Kilgore, correct?

12        A.   Yes.

13        Q.   Okay.  And what are the basis -- what basis are

14   you claiming that Kilgore discriminated against you?

15        A.   Race.

16        Q.   Okay.  Anything else, or would that be all?

17        A.   No.  The race, the harassment, the constant

18   withholdings of my compensation, the constant -- the

19   constant bickering with my superior over how much I make

20   every month.

21        Q.   And your claim is that all of those things that

22   you're alleging that happened occurred because of your

23   race.  Is that your allegation?

24        A.   Yes.

25        Q.   And all of those things that you just testified

Page 75

1    occurred only because of your race.  That's what you're

2    claiming?

3         A.  Yes, because they did not happen to the -- the

4    white salespeople at Kilgore.

5         Q.  Okay.  Let's talk a little bit more about that.

6    Can you please explain to me each and every alleged act

7    of discrimination that Kilgore did against you?

8         A.  I can't explain each and every one.  I don't

9    know.

10        Q.  Well, sir, this is your complaint, so I need

11   for you to tell me each and every one.

12        A.  I'm going to explain the ones that I remember.

13        Q.  Okay.

14        A.  So I was constantly being withheld my monthly

15   statements while the white guys were not.  Now, that's

16   years and years, obviously seven years.  Okay?

17             I was constantly asked to renegotiate in

18   December, and the white guys were not.

19             I, who had the largest projects and

20   required the most manpower on my projects, was having to

21   fight for manpower while the white salespeople did not.

22             I was blasted on emails in front of the

23   whole department as to why I was calling the technicians

24   while they were on the other jobs with the white

25   salesmen.  Your camera went off.

Page 76

1      Q.  I don't understand why this is happening.

2  We're back.  My apologies, and my hands are not even --

3  let's try it again.  Blasted on emails?

4      A.  Blasted on emails when my projects easily

5  showed I required more manpower, and I constantly had to

6  fight with my supervisor while the white guys got all

7  the preferential treatment.  Okay?

8              I specifically asked my superior -- I

9  wanted to know why my -- why my -- how do you say it, my

10 sales plan or my -- actually, what's it called?  Where

11 my -- I'm expected my -- shoot, man, what's that called?

12 My quota.

13             My quota was constantly increased while the

14 white guy's was not, who started with me on the same

15 day, Steve Saitas.  I made that request three years in a

16 row, why do you constantly raise my quota while Steve

17 Saitas' is not.

18             And I specifically in emails -- I don't

19 know.  Maybe not emails -- specifically in

20 conversations, asked them to present and show me Steve

21 Saitas's quotas  because I specifically told them, you

22 are being racist towards me because I sell more and I'm

23 Hispanic, but the white guy that started with me on the

24 same day, you can't show me his quota, you're harassing

25 me, you're being racist against me, specifically told

Page 77

1    him to his face.

2         Q.   Anything else, or would that be all?

3         A.   No.  There's much more, but I'm trying to

4    remember.

5         Q.   So at this time, you don't remember anything

6    else?

7         A.   Not at this time.  I mean -- hold on.  Okay.

8              Why -- why I was being targeted as the

9    sales plans being changed because I'm the highest.  Why

10   are you changing the sales plan and specifically calling

11   me as the reason to change the plan rather than, you

12   know, say as a team, we're doing better.  But it was

13   mainly because they didn't want to pay me more.

14        Q.   Would that be all?

15        A.   That's to the best I can remember, but there's

16   more.  I just can't remember at the moment.

17        Q.   Okay.  If at any point in time during the

18   deposition you remember, you let me know.  Okay?

19        A.   Okay.

20        Q.   So let's break these down.  The first thing

21   that you said was that you were constantly being

22   withheld your statements while the white employees were

23   not?

24        A.   Yes.

25        Q.   So let's talk about this.  What white employees

Page 78

1    are you referring to?

2         A.   Steve Saitas, Greg Cannell, Philip Hines.

3         Q.   Craig Cannell and who else?

4         A.   Philip Hines and Steve Saitas.

5         Q.   Okay.  Three people, right?

6         A.   Yes.

7         Q.   Okay.  And you know as a matter of fact that

8    all of these three individuals identify as white or

9    Caucasian?

10         A.   Yes, they're white.

11         Q.   My question is different.  You know as a matter

12    of fact that they identify as white or Caucasian?

13         A.   To the best of my knowledge, I know they

14    identify as white.

15         Q.   Okay.  Now, what was Steve's position?

16         A.   Service sales.  Oh, I remember -- I remember

17    another one.  In December of '16, I was specifically

18    asked to negotiate, meaning my commission should have

19    been upwards of 40.  I was asked to reduce it.  And I

20    think I -- I think I have the email.  I did send to

21    counsel.

22              I was asked to reduce it.  They -- they

23    butchered the sales plan, meaning they -- they doctored

24    it, my percentage.  And then I asked him specifically,

25    am I the only one you're doing this for, and he said no.

Page 79

1    I said, okay, if I'm not the only one you're asking to

2    doctor and manipulate the percentage, I need you to

3    prove that you've done -- you've done it to the other

4    white guys.  He could not prove it, and he would not

5    present me the documentation.

6         Q.  Okay.  Going back to what we were talking

7    about, the statements, Steve's position is service

8    sales, correct?

9         A.  Yes.

10        Q.  Is that your same position at the company?

11        A.  Yes.

12        Q.  How about Craig Cannell's position?

13        A.  Yes.

14        Q.  Yes, what?  He's service sales?

15        A.  Yes.

16        Q.  Okay.  And that would be your same position at

17   the company?

18        A.  Yes.

19        Q.  How about Philip?  What was his position in the

20   company?

21        A.  Service sales.

22        Q.  Okay.  And that would be your same position in

23   the company?

24        A.  Yes.

25        Q.  When you say that they were constantly

Page 80

1    withholding statements, what statements are you

2    referencing?

3         A.   The monthly sales statements.  And going -- I

4    wanted to add to that monthly sales statement.

5         Q.   Go ahead.

6         A.   In 2017, they withheld them for nine months,

7    and it became a battle.

8         Q.   Okay.

9         A.   Because of a software issue from changing

10   softwares that they claim, and then I had to

11   forcefully -- forcefully ask for paperwork and

12   documentation because at the end of the nine months,

13   they claimed that all four salesmen were in the -- in

14   the red.

15               And then I called BS, and this is another

16   example of Paul's manipulation, and he said prove it.  I

17   said, well, I have no access to your software, you have

18   to give me documentation.  That's where Paula Seddon

19   gave me documentation, and I proved they were wrong.

20   His statement was wrong for nine months.

21               Then he asked me to cover it up and not say

22   nothing while he did damage control because he now owed

23   all four salesmen money.  Of course, I was the largest.

24   He asked me to not say nothing.  I did because that was

25   a lot of people's money at the time.

Page 81

1              He owed thousands of dollars, and it was
2      going to affect his statement, and he had made a drastic
3      mistake for nine months.  So that's another part of the
4      harassment.
5          Q.  Let's talk about that for a minute.  You said
6      that in 2017, the statements were withheld for nine
7      months because of software issues, right?
8          A.  Yes.
9          Q.  So that was -- they were not withheld because
10     they were discriminating against you for being Hispanic,
11     correct?
12         A.  Well, that's --
13              MR. HODGES:  Objection, form.
14         Q.  (BY MS. ALFARO)  Mr. Carmona, my question is
15     simple.  You stated and you've agreed, and you stated
16     under oath, that those statements were withheld because
17     of software issues, not because you were Hispanic,
18     correct?
19         A.  Well, just in that year.
20         Q.  Okay.
21         A.  But the -- but I had --
22         Q.  There's no question on the table.  And with
23     regards to this -- these software issues, you also
24     testified that all four employees, meaning the three
25     people that you're claiming are white, plus yourself,

Page 82

```
 1    the statements were withheld from the four of you,
 2    correct?
 3         A.   Uh-huh.
 4         Q.   Yes?
 5         A.   Yes.
 6         Q.   So you would say that that -- what you call
 7    that withholding of those statements to three Caucasian
 8    or white employees and yourself would not be
 9    discriminatory, correct?
10         A.   No, not in that instance.  But to add to that
11    scenario, I was called the ringleader among the four
12    because I was demanding meetings.  So I was called out
13    amongst the four, and I was called the ringleader.
14         Q.   Let me ask you something.  Did Steve request a
15    meeting?
16         A.   No.
17         Q.   Did Craig request a meeting?
18         A.   No.  Wait, wait, wait.  Wait, wait, wait.
19    Amongst the nine months, I think they did.
20         Q.   You think.  Are you sure?
21         A.   Yeah, I'm sure they did.
22         Q.   Now, going back to your original statement,
23    which was that you were constantly being withheld
24    statements and not -- the white individuals were not,
25    you say that this was constantly happening.  I need to
```

Page 83

1    know all of the instances that you specifically recall,

2    and I'm requesting dates of statements that were

3    withheld.

4         A.  Well, we can go back to when this -- the

5    commission started to change in '16.  I can -- I don't

6    know specific dates, but there were several months

7    throughout '16, '17, '18, '19 and '20.  That is when my

8    commissions start to skyrocket, and they were starting

9    to withhold them, specifically because he did not -- and

10   these were direct conversations with Paul.  The large

11   payouts were affecting his balance sheet, and they

12   were --

13        Q.  The question was --

14        A.  -- year after year --

15        Q.  There's no question on the table right now.  My

16   question is, we're talking about dates.  You told me

17   2016, 2017, 2018, 2019, 2020.  Now -- but you don't

18   recall specific dates.

19             Then let me ask you this question.  For

20   every single month of every single year between 2016 and

21   2020, were your statements withheld?

22        A.  Yes, not every month.

23        Q.  Okay.  So that was my question.  Let's talk

24   about this again because we have to be precise.  It's

25   important.  My question was, for every month between

Page 84

1    2016 and 2020, is it your claim that your statements

2    were withheld for each and every month?

3         A.  I can say 50 percent of the time, they were.

4         Q.  That's not my question.  My question is, for

5    every month of every year between 2016 and 2020, were

6    your statements withheld, yes or no?

7         A.  Six months out of the year, they were.

8         Q.  That's not my question, Mr. Carmona.  You've

9    got to listen to my question and answer my question.

10        A.  Not every month.  Not every month, they were

11   not, but --

12        Q.  Okay.  They were not.  Now, which months, from

13   2016 to 2020, specifically were they withheld?

14        A.  I can unequivocally tell you, every December

15   they were.

16        Q.  Besides December for every year, any other

17   month that you can state with certainty that they were,

18   these statements were withheld?

19        A.  Okay.  And it will be easy to pin down.  When

20   the statements were over 20,000, they were withheld.

21        Q.  That's not my question.  My question is regards

22   to date.

23        A.  I don't know.

24        Q.  With regards to date.

25        A.  If I can go to the time when the amounts were

Page 85

1  over 20,000, that's when they were withheld.  So I can

2  go back and --

3      Q.  So with regards to dates, besides telling me

4  that every December between 2016 and 2020, your

5  statements were withheld, you cannot tell me precisely

6  what months your statements were withheld?

7      A.  No, without looking at the actual -- going back

8  and looking at the actual statements, no.

9      Q.  And, then, on each December from 2016 to 2020,

10  were the statements from Steve withheld?

11      A.  No.

12      Q.  How do you know?

13      A.  Because I was -- we would ask each other.

14      Q.  You're testifying today that you spoke with

15  Steve and Steve told you in 2016, December 2016, that

16  the statements were not withheld?

17      A.  Yeah.  We would talk to each other, what was

18  your statement, did you get your statement.  Yes, I did.

19  No, I didn't.  Yes, I did.

20      Q.  So you asked Steve -- is your testimony here

21  today under oath that you asked Steve in December 2016

22  whether he had gotten his statements?

23      A.  Yes.

24      Q.  Is your statement today here under oath that

25  in December 2017, you asked Craig whether he had gotten

Page 86

1   his statements?

2      A.  I don't think I asked Craig.  I asked Philip,

3   Philip and Steve.

4      Q.  Okay.  So when you say that all of the white

5   employees, their statements were withheld, that's an

6   incorrect statement.  You don't know that?

7      A.  I don't know if Craig's was, but -- I don't

8   know, but I asked Paul to prove that -- why was mine

9   being withheld, and he could not prove it.

10      Q.  Okay.  I'm going to ask you one more time, to

11   be clear.  Can you unequivocally say that from 2016 to

12   2020, December 2016 through December 2020, you asked

13   Steve and Craig and Philip and you absolutely know from

14   personal knowledge, as a matter of fact, that their

15   statements were not withheld, or would that be an

16   incorrect statement?

17      A.  Every December --

18      Q.  Yes, sir.  That's what you told me, that those

19   were the ones you knew.

20      A.  No.  Every December, mine were withheld.

21   Whether theirs was withheld, it was only certain

22   specific times.  Like, the one in '16 was specific

23   because my commission plan was being -- it was being

24   doctored.  So in '16, I can confirm that I was the only

25   one withheld.

Page 87

1      Q.   Can you confirm that in 2017, your statements
2   were the only ones withheld?

3      A.   Say it again.

4      Q.   Can you confirm that in December 2017, your
5   statements were the only ones withheld?

6      A.   No.  Like I said, in the nine months, I think
7   everybody's was withheld.

8      Q.   And in 2018, December 2018, can you confirm
9   that your statements were the only ones withheld?

10      A.   Yes.

11      Q.   Can you confirm that you asked Steve whether
12   his statements had been withheld in December 2018?

13      A.   Yes.

14      Q.   Can you confirm that you asked Craig in
15   December 2018 whether his statements were withheld?

16      A.   Yeah, yes.

17      Q.   Can you confirm that you asked Philip in
18   December 2018 whether his statements were withheld?

19      A.   Yes.

20      Q.   How about in December 2019?  Can you confirm
21   that you were the only employee whose statements were
22   withheld?

23      A.   '19?  '19, I can only recall December.
24   December was the only ones I can always recall because
25   those were the worst.

Page 88

1    Q.  And that's the only one I'm asking you because

2   those are the only ones you've been able to identify.

3   So for the statements of December 2019, do you know, can

4   you confirm that as a matter of fact, your statements

5   were the only ones withheld?

6    A.  Yes.

7    Q.  Did you talk to Steve about this and confirm

8   this?

9    A.  Yes.

10    Q.  Did you talk to Craig and confirm this?

11    A.  Yes.

12    Q.  Did you talk to Philip and confirm this?

13    A.  Yes.

14    Q.  And then December 2020, you weren't working for

15   the company, correct?

16    A.  I wasn't there.

17        THE REPORTER:  You said December 2010?

18        MS. ALFARO:  2020.

19    Q.  (BY MS. ALFARO)  Okay.  The second -- well,

20   before we do that -- and it is your testimony today

21   under oath that the only reason you believe these

22   statements were withheld from you was because you were

23   Hispanic, correct?

24    A.  Hispanic, and because they were large payouts.

25    Q.  And when you say they were large payouts, what

Page 89

1    you're trying to tell me is the company didn't want to

2    pay you simply because you were earning a lot of money.

3    Is that what you're telling me?

4         A.   Well, specifically because of the -- Paul did

5    not want them to hit in that calendar year.  He wanted

6    to push them to the next calendar year.  So if I

7    actually -- the statement was run in December.  But if I

8    actually got the payment in January, it would not affect

9    his payout that calendar year.

10        Q.   Okay.  So let me do this.  The reason these

11   statements were not being provided to you and these

12   payouts were not being made to you, was it really

13   because they were large, not because you were Hispanic?

14        A.   No.  It's both because -- because I can -- I

15   know that Steve's were not as large.  He was the second

16   guy.  But where mine were in the 40s, his may have been

17   in the 20s and 30s, which are still large.  He would get

18   paid, and I wouldn't.

19        Q.   And this is exclusively based on the fact that

20   Steve is white.  You have no other evidence to prove

21   this discrimination, correct?

22        A.   Yeah, Steve is white.

23        Q.   Okay.  And this question is important.  Other

24   than the fact that Steve is white and your race,

25   pursuant to how you identify yourself, is Hispanic, you

Page 90

1    have no other evidence of race discrimination, right?

2        A.   No.   Are you talking about with others or

3    with --

4        Q.   No.   I'm talking about any other evidence that

5    you might have of race discrimination.   My

6    understanding, based on your testimony, is that your

7    only evidence of race discrimination is the fact that

8    these other individuals are white, but if there's any

9    other evidence, I need to know.

10       A.   Yeah.   I mean, that there were -- they were

11   white, and they were given preferential treatment.

12       Q.   Okay.   And that would be the extent of the

13   evidence of discrimination that you have, correct?

14       A.   Uh-huh.

15       Q.   Yes?

16       A.   Yes.

17       Q.   Thank you.   Okay.   Let's go to the second

18   allegation that you made.   You said that they constantly

19   asked you to renegotiate in December while the guys --

20   white guys, as you referred to them, were not.

21            Let's break this down.   Who constantly

22   asked you to renegotiate in December?

23       A.   Paul.

24       Q.   And what was he asking you to renegotiate in

25   December?

Page 91

1      A.   Well, he was asking me to push it into the next

2    calendar year, but there was one year specific, '16,

3    where he manually -- manually entered the percentages on

4    the spreadsheet to decrease my payout.

5      Q.   When did you file your charge of

6    discrimination, what year?  Do you recall?

7      A.   When?  With -- against Kilgore?

8      Q.   Against Kilgore, yes, sir.

9      A.   I think it was --

10     Q.   Let me help you here a little.  So your

11   termination was October 26, 2020.  We can -- we can

12   affirm that that charge of discrimination was filed

13   after your termination, right?

14     A.   Yes.

15     Q.   Okay.  So do you recall, give or take, when

16   after October 26, 2020 you filed it?

17     A.   I don't know if it was -- I know it was within

18   a few weeks or months, maybe November, December.

19     Q.   Okay.  So it was in 2020?

20     A.   I think so.

21     Q.   Okay.  And that charge of discrimination, did

22   you file it on your own, or were you advised by counsel?

23     A.   No.  I filed it on my own.

24     Q.   When did you hire Kennard as your attorneys?

25     A.   I think -- I think December or January.  I

Page 92

1    don't know.  I don't remember.

2         Q.  2021, January 2021?

3         A.  Yeah, either December or January.

4         Q.  And in your charge of discrimination, what was

5    your claim, also racial discrimination?

6         A.  Yes, racial discrimination.

7         Q.  Now, going back to what you were telling me,

8    you're telling me that Paul constantly asked you to

9    renegotiate in December your, I guess, bonus payments?

10        A.  Yes.

11        Q.  While he was not asking the white guys to do

12   so.  So in December 2016, did he ask you to renegotiate

13   your bonus?

14        A.  Yes.

15        Q.  From what amount to what amount?

16        A.  There was a percentage -- a percentage

17   spreadsheet that was emailed to me that I emailed to my

18   counsel.  It was a breakdown on how he doctored it, and

19   on the spreadsheet, it shows what he's supposed to be

20   paying me, which -- and then he sent it to me saying

21   this is what he thinks is fair.

22        Q.  Was there any explanation given to you as to

23   what fair meant?

24        A.  Yeah.  He tried to say this is the guidelines.

25   You should be in the 20 percent profit, but you're in

Page 93

1    the 40.  I said, well, I did my job well, I managed the

2    project well, why -- why are you asking me to get paid

3    less.  And, then, that's when I said, are you doing this

4    to the other guys.

5        Q.  Okay.  I need to understand.  I'm not

6    understanding.  What was it specifically that you

7    believe you were entitled to versus what Paul was

8    offering you?

9        A.  Yes.  I'm entitled to the sales plan.  I get

10   20 percent of net, meaning because --

11       Q.  And what was Paul trying to tell you that you

12   would receive instead?

13       A.  He was manually entering other percentages that

14   lowered my commission, meaning instead of 20 percent

15   net, he felt like I should get 15 percent or whatever

16   the spreadsheet shows.  I don't have it in front of me.

17   And it's a manual entry, and he shows the guideline.  He

18   shows what I should get paid, and he even highlights it.

19       Q.  So let me ask you this.  For December 2016,

20   what did you get paid, what you felt you were entitled

21   to or less?

22       A.  Oh, I got --

23              THE REPORTER:  I'm sorry.  What?

24              THE WITNESS:  I got less.

25       Q.  (BY MS. ALFARO)  And when you got less, what

Page 94

1   did you do about that?

2          A.   That's when we -- I demanded the meetings.

3          Q.   Okay.   What happened?

4          A.   I was told -- I was told that the sales plan

5   was changing and that they could not afford to pay a

6   sales guy 300,000.

7          Q.   And once they told you that, what, if anything,

8   did you do about it?

9          A.   I mean, what could I do?

10         Q.   That's not my question.   My question is what,

11  if anything, did you do about it?   Is the answer

12  nothing?

13         A.   Nothing.

14         Q.   And you're claiming that from 2016 to 2020,

15  neither Steve, Craig nor Philip -- and this is your

16  personal knowledge.   Paul never asked them to

17  renegotiate their commissions, incentives or bonuses?

18         A.   Yes.   Now --

19         Q.   Can you state that as a matter of fact, or are

20  you assuming that?

21         A.   No.   In regards to this one situation, I asked

22  him to present documentations that he had done that to

23  other guys, and he did not, and he never did.

24              Now, the plan changed for the whole team in

25  regards to the fact that I was making too much money,

Page 95

1    but in this specific instance, I specifically asked him,

2    show me that you have done this to the other guys, and

3    he never did.

4         Q.  Okay.  So in 2016, you asked Paul to show you

5    that he had done this to the other people, and you've

6    stated he never did?

7         A.  Yes.

8         Q.  But you don't -- other than Paul never showing

9    you confidential employee documents, you don't have

10   proof that this happened to the other folks, correct?

11        A.  No.

12        Q.  Okay.  Now, you've talked to me about the plan.

13   I'm assuming that's the incentive plan changing for the

14   whole team, for all four of you?

15        A.  Yes.

16        Q.  Okay.  So when the company changed the numbers

17   or the compensation, they did it across the board, to

18   the white guys and to yourself, correct?

19        A.  Yes.

20        Q.  The next allegation that you testified about

21   was that you would have to fight for manpower, correct?

22        A.  Yes.

23        Q.  Okay.  So let's talk about this.  Tell me each

24   and every instance that you had to fight for manpower.

25        A.  I would specifically call service managers,

Page 96

1    dispatchers.  While my projects were in the hundreds of

2    thousands and required more manpower, I would

3    specifically have to fight with Paul when the white guys

4    had small jobs.  Yet I had to fight to get manpower on

5    my projects that were much larger from them.

6              So the preferential treatment of allocating

7    manpower was always a struggle because it's almost --

8    man, the first four years were awesome.  Now it became a

9    vendetta to try to make me look bad by having my jobs

10   struggle so that he could get rid of me.

11        Q.  Who told you that they were purposely trying

12   to -- this had become a vendetta and purposely trying to

13   make you look bad, or is that your assumption?

14        A.  No.  He would -- he would bring me in the

15   office and say, you're going to make more than me this

16   year again.  And he specifically said, if it wasn't for

17   how talented I am, he would have got me fired long ago.

18   Paul's words himself.

19        Q.  So let me ask you this.  Was this a battle for

20   money?  I mean, was Paul really just mortified that you

21   were making more money than him?

22        A.  Oh, yeah.  It was -- let me tell you how

23   mortified.  In '18, we had the same topic, you're going

24   to make more than me this year, and I -- I guessed his

25   salary.  So he went to the other VPs asking if they had

Page 97

1    told me his salary because he was embarrassed that I was

2    going to make more than him again this year.

3         Q.  So the real issue that Paul had against you was

4    simply a money one, that you were making more money than

5    him, right?

6         A.  I think it was both.

7         Q.  Which both?  One money and the other one being

8    what?

9         A.  Racist, because I think Steve made more than

10   him, too, but Steve was never treated like this.

11        Q.  So let me ask you this.  If Paul was racist,

12   why would he have hired you from the get-go?

13        A.  Because he -- he admitted that he had never had

14   a sales guy with the vast technical experience that I

15   had.

16        Q.  Yeah, but that doesn't answer my question.  I

17   mean, if Paul was racist, he knows this from the get-go.

18   Yet he decided to hire you.  Can you explain that?

19        A.  Maybe at the time, money contributed to hiring

20   me.  He thought he could get bigger bonuses if he had a

21   knowledgeable sales guy.

22        Q.  So that's what I'm saying.  It really boils

23   down to money, not to your race, right?

24        A.  No, because Steve made more money.  He

25   wasn't -- he wasn't treated as I was.

Page 98

1      Q.   How much money did Steve make?

2      A.   I think towards the end, Steve started to make

3   more than Paul, which was probably 160.

4      Q.   You say that you think.  You don't have any

5   knowledge on that.  That's your assumption, right?

6      A.   That's my assumption, but it was either close

7   or more.

8      Q.   So going again, that's your assumption.  You

9   have no personal knowledge about that?

10      A.   No.

11      Q.   So you can't really say, as a matter of fact,

12   whether Steve ever made more money than Paul, correct?

13      A.   No.

14      Q.   So going back to the manpower, tell me each of

15   the instances that you had to fight for manpower with

16   dates.

17      A.   Obviously, the large FMC project that -- I

18   mean, in some cases, I had six, seven guys.  And Steve

19   would make a call for one service call, which was

20   probably a $2,000 service call, and my project was

21   700,000.  And he would go to Paul and pull one of my

22   plumbers or one of my electricians, and I'd have to

23   fight.  Like, no, my project dictates the manpower,

24   700,000.

25      Q.   I need specific situations with specific dates

Page 99

1    and specific names.  So tell me to the best of your

2    recollection, or if you can't recollect any specific

3    instance, tell me as well.  But I need specific

4    instances.

5         A.   Well, what I can say -- I can't say specific

6    dates.  I can say -- I can say April -- April of '20 to

7    when I left October 26th, there was many instances

8    because that was the largest -- that was the largest

9    project in the department, holding the department up

10   during the Corona.  Again, I had the largest project

11   during the Corona.

12        Q.   So before we continue talking about this, just

13   to be clear, that's the only specific instance you can

14   recall by date?

15        A.   No.  I mean, throughout the years, there were

16   many.

17        Q.   But the many ones that you tell me, can you

18   recall by date, incident, situation, people or just --

19        A.   Okay.  In '16, when I had the large Halliburton

20   project that was about $800,000 also, required many

21   manpower, and it was constant fighting, hey, Steve wants

22   this guy, Steve wants that guy.

23        Q.   Okay.  So what guy did Steve want?

24        A.   Plumbers and electricians.

25        Q.   What were their names?

Page 100

1    A.   Shawn Kaufman, Ryan -- I don't remember Ryan's

2    last name.  Electricians.  I'm not sure of electricians'

3    names.  Ed and --

4    Q.   So let me ask you this.  Are you just naming

5    electricians, or you're naming people that were actually

6    pulled from your project and on Steve's?

7    A.   No, pulled from my project, pulled from my

8    project.

9    Q.   So John, Ryan and Ed, right?

10   A.   John, Ryan, Shawn, Ed.  I don't know.  I don't

11   think Ed was at that in '16.  Ed was at the FMC project.

12   I'm trying to think.  Ryan.  So these are specific guys

13   that throughout the project -- because again, that

14   project in '16 was about six months.  They were pulled

15   various times throughout the project.

16   Q.   So let me get this straight.  These guys were

17   assigned to your project, correct?

18   A.   Yes.

19   Q.   And your complaint is that they were assigned

20   to -- when Steve needed them, they were assigned to his

21   project, yet all these electricians were Kilgore

22   employees, I'm assuming?

23   A.   Yes, they're Kilgore employees.

24   Q.   Okay.  And they're hired to work on multiple

25   projects, right?

Page 101

1      A.   Yes.

2      Q.   And again, your statement is that in the

3  Halliburton project of 2016, John, Ryan and Shawn at

4  some point in time were pulled from your project to

5  Steve's project, correct?

6      A.   Yes.

7      Q.   And you claim that this was a discriminatory

8  act, correct?

9      A.   Yes.

10     Q.   And the only evidence that you have of it being

11 a discriminatory act is the fact that you're Hispanic

12 and you claim that Steve is white?

13     A.   Yes.

14     Q.   Okay.  And, then, the other event with regards

15 to manpower that you specifically mentioned is one from

16 April 2020 to your termination date of October 26, 2020.

17 But you said that it happened there in many instances,

18 but do you recall any specific instances?

19     A.   When I say it happened many times, I mean, I

20 can't remember the exact dates.  But throughout the

21 years, it would happen so much that I would also try to

22 call technicians off his jobs, and I was email blasted

23 as to no salesman can make a call to pull another

24 technician off another salesman's job without dispatch

25 or a service manager being involved.

Page 102

1           Now, I was the only salesman blasted in the

2    entire department, when Steve also did it.  So I brought

3    on the complaint to Paul, you're being racist.  If Steve

4    does it, you need to blast the department also, and he

5    would not.

6           I said here's -- so it wasn't, oh, I'm

7    bringing this after I was terminated.  It was many

8    instances where I brought it to his attention, you're

9    being racist.  If you're going to blast me, you need to

10   blast him.

11        Q.  Then again, the only reason why you claimed to

12   Paul that he was being racist was because Steve was

13   white, correct?

14        A.  Yeah.  So if it wasn't racism, why was he not

15   blasting him on the whole department when the same

16   circumstance would happen?

17        Q.  So when you say you were email blasted, was

18   this email only sent to you?  Is that what you're trying

19   to tell me?

20        A.  No, no.  It was sent to dispatch, supervisors.

21   All the other salesmen were copied.  The white

22   salespeople were copied.

23        Q.  Okay.  So let's talk about that email blast

24   that you're referring to, and in that email, was it sent

25   to all the sales managers or --

Page 103

1     A.   Yeah.   It was sent when I did it.   When Steve
2  did it, it was not sent.
3     Q.   That wasn't my question, Mr. Carmona.   My
4  question was -- I'm trying to decipher and establish for
5  the record that email blast that you're referring to.   I
6  want to explain to the jury what that email blast was,
7  and let's go one by one.
8             An email was sent, and that email was
9  directed to all sales managers, not exclusively to you,
10  correct?
11     A.   Yes.
12     Q.   And based on your testimony, that email stated
13  instructions as to what the salesmen -- sales managers
14  had to do to pull technicians from other projects,
15  correct?
16     A.   Yes.
17     Q.   Did that email specifically mention you, that
18  you could not do that?
19     A.   No.
20     Q.   Now, again, with regards to the many instances
21  that you talked to me and during 2020, any specific one
22  by date and names that you recall?
23     A.   Specific ones by date?   What I told you, from
24  April to October.
25     Q.   Okay.   Many instances, but you can't specify

Page 104

1    what those instances are, correct?

2         A.   No.   We had anywhere from four to ten people on

3    that project for -- what is -- April, May, June, July,

4    August, September, October.   Six months.

5         Q.   I understand.   But your testimony would be

6    today -- and correct me if I'm wrong so that this can be

7    clear to the ladies and gentlemen of the jury -- that

8    you cannot specify -- other than telling me that there

9    were many instances, you cannot specify a specific

10   instance by date or by names, correct?

11        A.   No, not by --

12        Q.   In this 2020 period, correct?

13        A.   Not by specific dates, but I can --

14        Q.   So let's talk about the next allegation that

15   you've made.   So the next one was being blasted on

16   emails, which we've talked a little bit about now.   So

17   the email blast that you referred to sent out with

18   instructions to all sales managers, would that be this

19   instance that you mentioned?

20        A.   Uh-huh.

21        Q.   Yes?

22        A.   Yes.

23        Q.   No other instance of email that was blasted

24   that you're claiming?

25        A.   No.   That's my point.   I was the only one

Page 105

1    blasted while the other white salespeople --

2        Q.   Not my question, Mr. Carmona.   My question, in

3    this allegation that there were emails blasted, we've

4    already talked here about one that was directed at all

5    sales managers, not specifically towards you, with

6    instructions as to how to pull technicians from a

7    project.

8             Besides that email that we've already

9    discussed here today, was there any other email that

10   you're claiming that was blasted?

11       A.   That was just done to me.

12       Q.   So this one is the only incident, correct, with

13   regards to this?

14       A.   No.   It was only done to me when I did it.

15       Q.   I understand that.   That's your allegation.   My

16   question is, were there more emails than the one we've

17   just talked about?

18       A.   Yes.   That's what I'm saying.   When I opted to

19   try to pull a salesman, a technician, it was -- the

20   blast was only done when I did it.   So there was -- the

21   email blast was probably sent, in a matter of a year,

22   five times, but the battle between me and the other guys

23   was constant.

24       Q.   Okay.   So when were these five emails sent?

25   Tell me.

Page 106

1          A.   They were probably sent more in '19 and '18.

2          Q.   Okay.   When you say there were probably more

3      sent, you really don't know when they were sent,

4      correct?

5          A.   I don't know the specific month or date, but I

6      know that they were sent.

7          Q.   So if you don't recall the specific month or

8      date when they were sent, how do you recall that these

9      pertained to you and they were directed at you even

10     though they didn't mention your name and were sent to

11     all other service managers?

12         A.   Well, because the moment they were sent,

13     I (audio distortion) --

14         Q.   I'm sorry.  It's cutting out.

15         A.   (Audio distortion).

16         Q.   I'm sorry.  Can you repeat that?  It's

17     cutting -- breaking up.

18               MS. ALFARO:  Is it breaking up for all of

19     you?

20               THE REPORTER:  Yes.

21               MR. HODGES:  Yes.

22         Q.   (BY MS. ALFARO)  I think it's frozen right now.

23     Mr. Carmona?  Mr. Carmona, can you hear me?

24         A.   Yes.

25         Q.   Okay.  So you were breaking up for all of us,

Page 107

1   so we couldn't get that last response that you gave.

2   And my question was, how do you know that those emails

3   that you don't recall a date on that were sent to all

4   service managers, with no specific mention of your name,

5   were directed at you?

6       A.   Because they were -- they were sent after we

7   had a disagreement over manpower, when I had

8   disagreements.

9       Q.   Okay.  So when did you have these disagreements

10  over manpower so that I can identify when the emails

11  were sent?

12      A.   Between '18 and '20.

13      Q.   You can't give me specific dates or specific

14  projects or specific people or specific instances,

15  correct?

16      A.   No.  If Paul could release them emails, you can

17  get specific dates.

18      Q.   Mr. Carmona, my question is, you -- you, who is

19  bringing this claim, cannot give me specific dates or

20  names or times or projects with regards to --

21      A.   I don't -- I don't --

22      Q.   Let me answer -- let me finish my questions.

23      A.   I don't have access to the server.

24      Q.   Let me finish my questions.  I'm going to

25  repeat it again.

Page 108

1     A.   It's breaking up, so that's --

2     Q.   Okay.  Can you hear me?

3     A.   I can hear you now.

4     Q.   Okay.  You have to listen to my question and

5  let me finish my question.  It helps you and it helps me

6  to have a clear record.  When we talk over each other,

7  it's very hard for the court reporter to transcribe.  So

8  let's just be patient.  Okay?

9     A.   Okay.

10    Q.   My question is the following:  Is it correct to

11 say that you don't have specific dates, nor specific

12 disagreements, nor specific projects, nor specific

13 people that you can mention to me with regards to these

14 emails that you claim that were sent against you?  Is

15 that correct?

16    A.   If Paul can release the emails, we can get

17 specific dates.  I don't have the dates in front of me.

18    Q.   My question has nothing to do with Paul,

19 Mr. Carmona.  You have to answer my question because

20 you're certainly listening to them and understanding

21 them.

22         My question is, do you, Mr. Rudy Carmona,

23 have any dates or people or disagreements or --

24    A.   Okay.

25    Q.   -- specifics -- you've got to let me finish --

Page 109

1    regarding these emails that we were talking about?  If

2    the answer is yes, it's yes, and if the answer is no,

3    it's no.

4         A.  I can have dates if I can access the project

5    files.

6         Q.  So currently, you have no dates, and currently,

7    you have no specific information?

8         A.  No, because I don't have access to the server.

9         Q.  Okay.  So that means that currently -- and

10   again, you have to answer my questions.  It's part of --

11        A.  I am answering because I would have to --

12        Q.  No.  But my question is currently, you have no

13   information, specific information, correct?

14        A.  I don't have information because I don't have

15   access to the server.

16        Q.  So, therefore, you don't have information --

17   this claim that you're making with regards to these

18   emails is speculative?

19        A.  No.  If I have access to the server, it would

20   not be speculative because I could point it out.  I gave

21   you the months when the projects were there.  Throughout

22   the projects --

23        Q.  Exactly my point, exactly my point.  Since you

24   don't have that information, the information that you're

25   providing me is speculative, correct?

Page 110

1        A.   If my counsel can ask for the --

2        Q.   Mr. Carmona, I'm asking --

3        A.   -- for those to be released, then I can give

4    you specific dates.

5                 MS. ALFARO:   Is it breaking up for

6    everybody?

7                 THE REPORTER:   Yes.

8                 THE WITNESS:   It's breaking up.

9        Q.   (BY MS. ALFARO)   Yeah.   I can hear you now, but

10   everything that you said was broken up for all three of

11   us.   I think it's frozen again.

12       A.   Can you give me two minutes?

13                 MS. ALFARO:   Sure.   Let's take a

14   five-minute break.

15                 (A recess was taken.)

16                 MS. ALFARO:   Okay.   Are we ready to go back

17   on the record?

18                 THE WITNESS:   Yes.

19       Q.   (BY MS. ALFARO)   Mr. Carmona, I'm going to

20   remind you that you're still under the oath that you

21   took this morning.   Okay?

22       A.   Yes.

23       Q.   So I'm going to continue on the line of

24   questions regarding discrimination, but I have just a

25   couple of questions I want to clarify some things on.

Page 111

1   This employee that you mentioned by the name of Thanm,

2   he did not have your same position at Kilgore, right?

3        A.   In the hierarchy that Kilgore presented, we

4   were the same.

5        Q.   His --

6        A.   But a different position.

7        Q.   Okay.  So he had a different position?

8        A.   Yes.

9        Q.   And Thanm and yourself did not have exactly the

10  same tasks, duties or responsibilities, correct?

11       A.   Correct.

12       Q.   Earlier during this deposition, you mentioned

13  John Bussleman, correct?

14       A.   Yes.

15       Q.   And has he provided you with a written

16  statement with regards to this case?

17       A.   A written statement, no.

18       Q.   Let me ask you this.  Since your termination

19  from Kilgore, have you spoken with Steve Saitas?

20       A.   No.

21       Q.   Since your termination from Kilgore, have you

22  spoken with Craig Cannell?

23       A.   No.

24       Q.   Okay.  Let's go back.  So the next allegation

25  of discrimination that you testified previously about

Page 112

1    was about quotas, so tell me about that.  What happened

2    with your quotas?

3         A.   I was constantly being told each year that my

4    quota was going to be increased because I was

5    outperforming my quotas, and I said, you know, that's

6    not fair because Steve is not -- his quota's not being

7    increased.  And I specifically asked for proof if it was

8    because we started on the same date, March 18, 2013, and

9    he is white.

10        Q.   So your testimony is that Kilgore never

11   provided you with evidence of Steve's quotas being

12   increased, correct?

13        A.   Correct.

14        Q.   Did you ever see any quota documentation with

15   regards to Steve while you were there?

16        A.   No, but he -- I was very adamant and I --

17   again, I started the race conversation way back when,

18   you're being racist, Paul.  If you can't provide the

19   documentation, then you're being racist, and why is it

20   being done to me.

21        Q.   Let me ask a question.  Not providing you

22   confidential and private employee information with

23   regard to another employee, do you consider that to be

24   racist?

25        A.   If you can't be transparent in a request, then

Page 113

1    I think, yeah, it's being racist.

2         Q.   So do you think that a company has an

3    obligation to show employees what their other employees

4    earn or the compensation or the quotas?  Do you think

5    that's an obligation the company has, to share with

6    employees private, confidential information?

7         A.   It's not private because he presents it -- he

8    presents the year one -- year one employees' quota, year

9    two employees' quota, year three.  And I said, okay,

10   we're the same year, so provide me the proof.  Show

11   it -- year one, year two, year three, how the quotas

12   increase, but mine were drastically increasing, not

13   matching what he was presenting.

14        Q.   So the question was --

15        A.   So it was public knowledge --

16        Q.   -- you're requesting that the company provide

17   to you specific compensation information with regard to

18   a specific employee, and my question is, do you think

19   that that is an obligation the company has, to show what

20   their other employees are or aren't requested to sell?

21        A.   Yes.

22        Q.   And if a company does not show you that

23   information for another employee when you request it,

24   you believe that to be racist?

25        A.   Yes.  Can I elaborate why?

Page 114

1      Q.   No.   There's no question on the table.

2      A.   Okay.

3      Q.   So with regards to this specific allegation or

4  quota, that yours were being increased constantly while

5  Steve's -- you never saw proof of Steve, other than not

6  seeing proof of what Steve's quotas were, do you have

7  any other evidence of discrimination with regards to

8  quotas?

9      A.   Yes.   So to -- when I say Steve was starting to

10  make a -- make a run for trying to beat my seven-year

11  number one, during '18 or '19, when his DaVita account

12  started to take traction, Paul would present all the

13  sales team with here's where you're at, a chart, but

14  would not highlight each other's name, right?   So it was

15  almost like parading the fact that Steve's going to beat

16  me this year.

17           The moment I took -- the moment I regained

18  my number one, the bar and the spreadsheet was not

19  emailed no more.   So it was almost like, yeah --

20      Q.   I'm so sorry.   Your testimony's cutting up on

21  my end.

22           MS. ALFARO:   Is it cutting up on the court

23  reporter's end?

24           THE REPORTER:   Yes.

25      Q.   (BY MS. ALFARO)   Okay.   I'm sorry.   Because we

Page 115

1    couldn't catch all that you were saying, could you

2    repeat that, please?

3        A.   Okay.   2018 when Steve Saitas was making a run

4    to be number one, there was a bar chart that was being

5    emailed that would only show your name, but it would not

6    show the others.   And obviously, it was more to try to

7    get competition between sales guys, but the moment,

8    again, before Rudy Carmona took number one over at the

9    end, the chart and email was not sent out no more.

10       Q.   So I don't understand.   How was this

11   discriminating against you?

12       A.   Well, how come when I took number one, the

13   chart wasn't continued to be shown?

14       Q.   Again, my question, why do you claim this to be

15   discriminatory against you?   How did it affect you?

16       A.   When I was number one, why was it not presented

17   as me being number one again?   You started the chart in

18   the beginning of the year.

19       Q.   And again, I'm trying to understand, but I'm

20   not.   So how does not presenting the chart when you're

21   number one affect you, grossly affect you in your

22   employment?

23       A.   How does it affect me?   Because the moment I

24   took number one, he did not want the rest of the team to

25   know I was number one again.   Why?   You started the

Page 116

1    chart in the beginning of the year.

2         Q.  Okay.  And again, how does this affect your

3    employment, other than the others not knowing that

4    you're number one?

5         A.  It is demoralizing because you don't want to

6    show the guy that has been number one over the past six

7    years, about to take it a seventh year.  Why don't you

8    want to show it?

9         Q.  And how do you know you were number one all

10   those years?  Were you told that information?

11        A.  Yes.  I was told by Paul.  Of course, other

12   departments knew it.  Other department VPs knew it

13   because they did not like that a sales guy was making as

14   much as a vice president of other departments, so -- and

15   Ken Kilgore said, I pay you too much in front of a

16   vendor.

17        Q.  I have a question.  Based on your testimony,

18   this company was doing all these things against you.  It

19   clearly seems you were not happy.  Why stay in there all

20   those years?

21        A.  It was my first sales job.  I was doing real

22   good, being compensated, but I had established a

23   relationship with my customers.

24        Q.  So you stayed because you were doing real good

25   and you were getting compensated?

Page 117

1        A.   Yeah, but it was a constant battle to fight for

2    what I've earned.

3        Q.   Okay.  The next allegation you mentioned with

4    regard to discrimination was that your sales plan was

5    changed.  I believe you told me earlier that there was a

6    year that the plan -- or there was a moment in time that

7    the plan was changed for everybody, right?

8        A.   Yes.

9        Q.   Okay.  So let's talk a little bit about that.

10   When was the sales plan changed?

11       A.   In '16 is when it was drastically changed from

12   the sales -- the salesman would take 50 percent of the

13   profit after overhead cost.  Then it was reduced to

14   20 percent.

15       Q.   And was this change in the compensation plan in

16   2016 done across the board, meaning to all the

17   salespeople?

18       A.   Yes.

19       Q.   That would include the white folks and

20   yourself?

21       A.   Yes.

22       Q.   How do you claim that this is discriminatory?

23       A.   Because I was the only one brung into a

24   meeting, specifically told, you know, you're -- you are

25   gouging the customers, so we have to change the plan.

Page 118

1          Then the other sales guys got mad at me

2    because I'm -- I was -- I was accused of gouging.  So

3    they're all mad at me, and then they realized they

4    shouldn't be mad at me because I'm just experienced in

5    managing projects to bring in high margins.

6          Q.  So the change was because you were making more

7    money, right?

8          A.  Yes, because they were used to sales guys

9    selling 1.2, and I was selling 2 and 3 million.  They

10   had never had a sales guy sell 2 or 3 million.

11         Q.  Would you agree with me that this change in

12   sales plan that affected everybody really had to do with

13   the fact that you were making more money and not your

14   race?

15         A.  That I was making more money?

16         Q.  Uh-huh, and not your race.

17         A.  Well, I think -- I think it was -- I think it

18   was both because Steve started to make more money, but I

19   was the only one brung into a meeting.

20         Q.  How much money was Steve making in 2016?  How

21   much more money was he making in 2016?

22         A.  Well, I think his -- I think his salary was

23   only 50,000, and I think he was making a hundred, 90 to

24   a hundred while I was making 150 to 160.

25         Q.  You were considerably making more in 2016 than

Page 119

1    the white guy, weren't you?

2          A.   Yes.

3          Q.   And your salary or your draw was considerably

4    higher than the white guy's, right?

5          A.   In '16, I think my -- yeah, but you have to

6    count my experience.  So I think my salary in '16 was

7    60, and his was 50.

8          Q.   So my question still remains the same.   In

9    2016, your salary was higher than the white guy's

10   salary, Steve's, correct?  I think you froze.

11   Mr. Carmona?

12               THE REPORTER:  Uh-oh.  Maybe he'll log back

13   in.

14               MS. ALFARO:  Let's give him a couple of

15   minutes.  He's been struggling, I think, with his

16   signal.

17               THE REPORTER:  I guess we're off

18   officially, right?

19               MS. ALFARO:  Yeah.  I guess till the

20   deponent comes back, I can't do anything else.

21               (A recess was taken.)

22               THE REPORTER:  Do you want me to read the

23   last question back that he -- we lost him before he gave

24   an answer.

25               MS. ALFARO:  Yes, please.

Page 120

1            (Requested text read)

2        A.  Yes.

3        Q.  (BY MS. ALFARO)  The last allegation of

4    discrimination that you mentioned to me earlier today

5    was that in December 2016, you were asked to negotiate

6    your commission and then reduce it.  Can you explain

7    that to me a little?

8        A.  Okay.  So there was a -- there was a project

9    that performed at a certain percentage of profit, and

10   this -- this is why it was very frustrating.  It was not

11   for the entire sales plan.  It was just for this one

12   payout.

13            They manually entered percentages in a

14   spreadsheet of what they thought I should get paid,

15   which is I feel based off -- we have a sales plan in

16   writing, and they doctored -- they doctored the plan,

17   manually entering and violating labor laws.

18       Q.  Okay.  Now, let's break this down.  What

19   project was this?

20       A.  It was for Halliburton.

21       Q.  Okay.  And this was in 2016, correct?

22       A.  Yes.

23       Q.  Okay.  And what was your sales plan on

24   commission or incentive at the time, percentage?

25       A.  At the time, it still should have been

Page 121

1    50 percent of net.

2        Q.   Okay.  And what did they manually try to reduce

3    it to?

4        A.   They tried to -- they tried to reduce the

5    percentage.  Instead of 50 percent -- so they did two

6    things.  They adjusted the overhead higher, which

7    would -- which would reduce my net.

8             And then they reduced my net.  Instead of

9    50 percent, they reduced it to -- I don't know.  I don't

10   remember what it was.  I have the document.  I sent it

11   to my counselor.

12       Q.   Okay.

13       A.   Because it was an email.  So I forwarded the

14   email showing the spreadsheet breakdown.

15       Q.   So when you talk about making the overhead

16   higher, were there caps or minimums to overhead that

17   would be deducted from the profits?  Is that how it

18   worked?

19       A.   Yeah.  So there was a sliding scale.  The

20   larger the project, the lower the overhead cost, so --

21   and this is according to their document.  That size of

22   project, I should have been getting a 12 percent

23   overhead.  I think he increased it to like 16,

24   18 percent, which we had a document, sliding scale, as

25   they called it, in place, and he manually adjusted it.

Page 122

1      Q.   Do you know how much you made with Kilgore in

2    2020?

3      A.   I'd have to get my tax statement.

4      Q.   Give or take.  It doesn't have to be an exact

5    amount.

6      A.   I think less than a hundred because I was not

7    given my last two -- I was not given my October,

8    November or December -- well, I wasn't there December,

9    but the statements are run every month, and according to

10   when the jobs get paid.

11     Q.   So do you recall, give or take, what you made

12   with Kilgore in 2019 which you worked a complete year?

13     A.   Yeah.  I think it was like 160, 70.

14     Q.   Okay.  So now that you're on your own, you told

15   me this last year, 2021, you made 600,000 net.  You're

16   making considerably more than you ever did at Kilgore,

17   correct?

18     A.   Yes.

19     Q.   Okay.  In going back to this commission and the

20   project of Halliburton and reducing the percentages, who

21   manually -- when you say manually entered, do you mean,

22   like, handwritten manually, or you mean somebody altered

23   the statement?

24     A.   No.  He pulled up a spreadsheet, had the

25   spreadsheet where -- a Microsoft spreadsheet where he

Page 123

1    enters the amounts, enters the percentages, and then it

2    spits out, you know -- you know, a Microsoft

3    spreadsheet, right?

4         Q.   Uh-huh.

5         A.   Enter the cost, enter the overhead.  He

6    manually entered it showing this is the breakdown and

7    said here's what we think that you should get paid.

8         Q.   Okay.  And when you say he, you mean Paul?

9         A.   Paul, yes.

10        Q.   You also mentioned -- you keep mentioning --

11   you use the word "doctor a document."  Is that the word

12   you're using?

13        A.   Yes.

14        Q.   And what does that mean to you?

15        A.   That means he -- in the email, he even shows

16   the outline of what I should get paid, which is -- I

17   don't even know why he did that.  It shows what a

18   $200,000 job should be charged in overhead, but in

19   the -- in the breakdown, he highlights it.  We're not

20   charging you 12.  We're going to charge you whatever it

21   was, 16, 18 percent.  We're going to charge you higher.

22   And it's not going to be 50 percent net; it's going to

23   be this, and it's highlighted.

24        Q.   And then you talked about violating labor laws.

25   What labor laws are violated and why?

Page 124

1        A.   Because he's -- he's forcefully changing my

2   commission plan.

3        Q.   Was your commission plan discretionary?

4        A.   No.   It was -- it was based off the document,

5   off the sales plan.

6        Q.   Do you know if that sales plan has any language

7   that the plan can be amended at any time?

8        A.   No.

9        Q.   You don't know that it has that language, or it

10  does not have that language?

11       A.   I don't know if it has that language.

12       Q.   Do you know if your employment with Kilgore was

13  at will?

14       A.   No, I don't know.

15       Q.   Do you know what at will is?

16       A.   No.

17       Q.   Okay.   I have a couple more questions.   One of

18  the claims that is made in the complaint is that you

19  were retaliated against.   How were you retaliated

20  against?

21       A.   How was I retaliated against?

22       Q.   If you know.   If you don't know that you were

23  retaliated, just let me know.

24       A.   No.   Yeah, I specifically know that -- again,

25  the retaliations were withholding my commissions when

Page 125

1    they were large, struggles with manpower,

2    specifically -- specifically told to my face that he

3    wanted to fire me.  Withholding -- well, that was done

4    to everybody, but --

5                    THE REPORTER:  Okay.  There's another

6    Eddie Hodges, Junior coming in.

7                    MR. HODGES:  Yeah.  It's my computer.  I

8    may have to show a document or two as well.

9                    THE REPORTER:  Okay.

10        Q.  (BY MS. ALFARO)  Okay.  Mr. Carmona, you can

11   continue.

12        A.  I'm trying to think, to be specific.

13                    Oh, okay.  This was a battle for two or

14   three years.  Part of our sales plan for the -- remember

15   I said it was in three portions, the projects, the T&M

16   and --

17        Q.  Mr. Carmona, you froze up again.  We couldn't

18   hear you.

19        A.  -- with his quote, and this is -- this is

20   specific to the T&M portion of our sales plan.

21        Q.  We can hear you now --

22        A.  Can you hear me?

23        Q.  -- but we didn't hear anything of your previous

24   statement.

25        A.  Okay.  In retaliation, it was specific between

Page 126

1    me and Steve, and this was a battle that was very

2    highlighted for about two or three years.  In the

3    breakdown of the commission between projects, T&M and

4    service, Steve would write hand notes, hand notes,

5    scribble scratch on a piece of paper what his quote was

6    for a specific customer.  If I had a quote on a Kilgore

7    letterhead, then it was considered T&M and not a quote.

8    Okay?

9            Steve would not provide a quote on a

10   letterhead.  He would provide it on a piece of paper.

11   Now, that percentage was vastly different, two percent

12   versus 10 percent.  And I would always tell Paul, you're

13   being racist, Steve does not provide these quotes to

14   DaVita on a letterhead.  You're making me do it.  Steve

15   does not.  Okay?  I'm going to take this to ownership

16   because that drastic difference of two or 10 percent on

17   T&M is important.

18           And Paul's response, well, he got -- he's

19   got to do a bunch of them a day.  I said, well, it's not

20   my fault that my projects are larger, but you are asking

21   me to spend time and put my quote on the letterhead

22   while he scribbles it on a piece of paper.  So I'm

23   treated different.  I'm retaliated against.

24        Q.   What is your definition of retaliation?

25        A.   Meaning I do something and he does something to

Page 127

1    hurt me.

2         Q.   What is it that you do that he does to hurt

3    you?

4         A.   He made it hard for me to gain my commissions,

5    like that instance right there.  So if Steve has to do

6    20 quotes on a piece of paper, but I have to sit in

7    front of a computer and I have to do 20, the time

8    difference is he can write them out in five minutes, and

9    I have to take hours to do it when it's the same thing.

10   It's a quote.

11        Q.   I understand, but the reasons as to why Paul

12   was making you do this differently --

13        A.   He was making it harder.  He was harassing me,

14   making my time harder.

15        Q.   You've got to let me finish.  Okay?

16        A.   Okay.

17        Q.   My question is, you claim Paul was making it

18   harder on you to do all these things, and my question

19   is, why do you claim that Paul was retaliating against

20   you?  What did you do that he wanted to retaliate?

21        A.   I was making more money than him, so he wanted

22   me out.

23        Q.   Okay.

24        A.   By making my job harder, he wanted me out.

25        Q.   So withholding your commissions when they were

Page 128

1  large, it was because -- it was all because of money,

2  correct?

3       A.   Race and money.

4       Q.   How did race play a part in it?

5       A.   Why wouldn't he hold the white guy's money?

6       Q.   So that's your only evidence of discrimination

7  with regards to withholding?

8       A.   No.  I just told you about the quotes, too, and

9  the manpower.

10      Q.   Okay.  How do you claim that Paul retaliated

11  against you with the struggles with regards to manpower?

12      A.   Again, I have -- and this was very visible

13  during the Corona because, like I said, apart from me

14  holding up the department, I have an $8,000 project and

15  Steve has a $200 service call, why are you pulling

16  manpower from my project.

17      Q.   You claim that that happened because of

18  discrimination, not retaliation, correct?

19      A.   Both.

20      Q.   So what did you do that you claim you were

21  retaliated against with regards of the manpower?  You're

22  muted.

23      A.   What did -- say it again.

24      Q.   What did you do that made Paul retaliate

25  against you?

Page 129

1      A.  I didn't do nothing.  I did my job.

2      Q.  Let's talk about the wanting to -- telling you

3  that he wanted to fire you.  When exactly did Paul tell

4  you that he wanted to fire you?

5      A.  Well, it started in '16 when the conversations

6  started to get bigger because we had a very difference

7  in opinion of managing projects and managing customers.

8  So there was -- there was constant battles.

9      Q.  And I'm hearing kids.

10      A.  Yeah.  Let me -- my daughter's in the

11  background.  Let me tell her.

12                (A recess was taken.)

13      A.  Okay.

14      Q.  (BY MS. ALFARO)  Okay.  So you were telling me

15  that in 2016, the conversation started to get higher --

16  there was difference of opinions as to how to manage the

17  projects, and the billing and all of that was Paul,

18  so --

19      A.  Yes.

20      Q.  So my question was, when specifically did Paul

21  tell you that he wanted to fire you?

22      A.  '16, '17, '18, or pretty much every year.

23      Q.  Okay.  So in 2016, when specifically, what

24  months did he tell you he wanted to fire you?

25      A.  Probably December.

1      Q.  When you say probably, do you know that it was

2  in December, or are you assuming?

3      A.  Well, it was around the time of that vast, big

4  fight over that one job.  So I can say December,

5  January.  That was the first time.

6      Q.  And that was because of money, you've explained

7  to me, right, you would make more money than he would?

8      A.  Yes, which was -- which falls into the racism

9  and harassment.  He's harassing me over my compensation.

10      Q.  Let's get something straight.  You're telling

11  me it's about money, it's about you making more money.

12  How does that jump into discrimination?

13      A.  Because, like I said, I think Steve was making

14  more than him also.

15      Q.  But we've established that you don't know.

16  You're assuming that?

17      A.  I don't know unless they turn over documents.

18      Q.  So for you to claim that this didn't happen to

19  Steve, you would have to speculate because you don't

20  know right now and you've never known?

21      A.  I'm only speculating on the words out of Paul's

22  own mouth that he said that he thinks he would make more

23  than him also that year.  But that was not towards the

24  end of the year, so they were not -- is concrete.

25      Q.  Paul's statement was not concrete; therefore,

Page 131

1    your statements are speculation, right, and they are

2    still speculation because you have no evidence of Steve,

3    the white guy, that you claim making more money than

4    Paul?

5         A.   No.   This was not speculation because it was

6    told out of his mouth, but the year was not over.

7         Q.   Okay.   So therefore -- so at the end of the

8    year, when you're claiming that you're having this fight

9    and Paul is telling you that he's going to have you

10   fired, and you told me it was because you were making

11   more money than Paul, you really don't know that that

12   has to do with discrimination.   You're assuming it has

13   to do with discrimination?

14        A.   Well, I'm assuming because Steve was assumed to

15   make more money.   He was not nowhere near treated like I

16   was.

17        Q.   And in 2017, when did Paul -- when specifically

18   did Paul tell you he wanted to get you fired?

19        A.   Probably after the meeting we had with Jeff

20   Kilgore where --

21        Q.   When you say probably, do you specifically

22   recall, or are you speculating?

23        A.   No.   I specifically recall because we had a

24   meeting where I basically embarrassed him in front of

25   ownership with regard --

Page 132

1      Q.   What happened in this meeting in 2017?

2      A.   It was -- it was still -- I was still upset

3   about the sales plan change, and from December -- I

4   think Paul did not outline the specifics of the sales

5   plan until about June.  So maybe March or April, I

6   demanded a meeting where we had a meeting with

7   ownership, me, Paul and Jeff Kilgore, and I ran four

8   sales -- I ran four statements, my T&M, my projects,

9   this.

10           When we entered the meeting, Paul entered

11   with nothing, and I entered with four reports, put the

12   four reports on the table and said, according to this

13   report -- and Jeff asked who ran these reports.  I said,

14   these were reports that Paul ran.  I can't run them.

15           The reports show that I'm 200 percent of

16   sales plan.  I'm doing this.  I'm averaging this

17   percentage.  Why are you choosing to change the plan

18   rather than reward me when I have proven my ability to

19   perform, which, of course, Jeff sided with the fact that

20   the plan was changed because we're not keeping up with

21   how well you're performing, which is BS.

22           But, then, he also acknowledged and

23   embarrassed Paul by saying, Paul, I think you need more

24   self-performers like Rudy that have the background and

25   the experience, and you have too much overhead, meaning

Page 133

1    you have sales guys that do not have the experience I

2    have to walk jobs alone so that other salespeople needed

3    support from the service manager, technicians.

4                So the more people we had back there, which

5    was what my argument was in the meeting, you are making

6    a statement that I am hurting the financials when the

7    financials are being hurt because you have too much

8    overhead.

9                So ownership, Jeff Kilgore, told Paul, I

10   agree with Rudy.  You have too many inexperienced people

11   that need resources to do what Rudy does.  Rudy does the

12   job of three people.  You need more people like Rudy.

13       Q.   So Jeff Kilgore backed you up, right?

14       A.   Partially.

15       Q.   Oh, okay.

16       A.   He acknowledged my -- my understanding that the

17   overhead was the main issue, not that I had large

18   payouts.  But again, Jeff Kilgore's greedy.  He still

19   said, we need to change the sales plan.

20       Q.   You said because Jeff is greedy?

21       A.   Yes.

22       Q.   Okay.

23       A.   Rather than opt to say, you know what, we need

24   to reward the guy that's performing, no, we're going to

25   change the plan because we don't care.  We're still

Page 134

1    going to take money from him.

2         Q.  So you didn't like Jeff's reaction to all of
3    this?

4         A.  No, and I made it very clear.  I told him it
5    was unfair.

6         Q.  And this plan in 2017 was changed across the
7    board, right?

8         A.  Yes.

9         Q.  You weren't the only one affected by the
10   change?

11        A.  I wasn't the only one, but I was the one that
12   it -- I was the one that was being as the scapegoat,
13   it's because Rudy is gouging.

14        Q.  Well, let's talk about that.  You say you were
15   being the scapegoat, yet this change in the plan that,
16   pursuant to your allegations, lowers your income,
17   lowered the income as well of the other three white
18   individuals that held your same position and were under
19   the same changed plan, correct?

20        A.  Correct.

21        Q.  So how can you claim that this was
22   discriminatory if the other -- everybody was under the
23   same change and the rest of the folks under the change
24   were white, not Hispanic?

25        A.  Because I was the only one that was told that I

Page 135

1   was gouging.

2         Q.  And Paul was the one that told you he claimed

3   that you were gouging clients, right?

4         A.  Paul was told -- yes.  Paul told me what he was

5   told, that he was told by ownership.

6         Q.  Okay.  Any other instance you recall Paul

7   telling you -- well, strike that.

8               So after this meeting with Jeff, Paul told

9   you that he wanted to fire you?

10        A.  Yes.  So let me ask you this.

11        Q.  No.  Wait.  Immediately after this meeting, did

12  Paul tell you -- this meeting with Jeff, did Paul tell

13  you that he wanted to fire you?

14        A.  I can't -- I can't -- no, not immediately.  It

15  was several weeks after.

16        Q.  When exactly did Paul tell you in 2017 that he

17  wanted to fire you?

18        A.  It was probably, like, in June.

19        Q.  What specifically did he tell you?

20        A.  That -- he specifically said if it -- he said

21  he's never had a sales guy as experienced as me, that I

22  can probably go down to Jeff Kilgore's office and

23  complain and he would probably give me the VP position.

24  So if I -- if I -- if there's any chance for me to mess

25  up, he's going to fire me.  Can you imagine being told

Page 136

1    that by your superior?

2        Q.   He told you this because of the money you were

3    making, you had stated before, right?

4        A.   Well, yeah, it's the money.  But can I add to

5    the retaliations?  You said if I remember anything --

6        Q.   Yeah, sure.

7        A.   Okay.  So part of the retaliation after '16,

8    because I embarrassed him with all the reports I showed

9    up and he had nothing to show for it in the meeting, the

10   metrics was changed of the sales plan.  Let me explain

11   the metric.

12             So a $1.2 million quota.  The metrics was

13   actual math.  Okay?  So 80 percent of my projects and

14   20 percent was maintenance.  Okay?  And that was actual

15   math.

16             He changed the metric because my projects

17   were so vastly -- you know, two million, you know, so it

18   showed my quota to be 200 percent of plan.  He changed

19   the metric to say now the 200,000 reflected to be

20   50 percent of my plan -- of maintenance, but every sales

21   guy knows, you get money on projects, not maintenance.

22             Even though -- even though -- even though I

23   had a half a million dollar book of business in

24   maintenance, which was probably five times more than the

25   second guy, but he changed the metric so that if we ever

Page 137

1    had a meeting again, I would not show that I was holding

2    up my quota.  So it's a doctored matrix, meaning how

3    does 200 percent -- how does 200,000 make up 50 percent

4    of my three million?  That doesn't make sense.

5              He retaliated so that if he was to ever

6    present where I'm at on my quota, I would show that I'm

7    not a hundred percent of my quota.

8         Q.   And your claim is that Paul retaliated against

9    you because you went to Jeff to complain about numbers

10   and money, correct?

11        A.   Uh-huh.

12        Q.   Okay.  Now, you've talked a couple of times

13   about T&M.  What's that?

14        A.   Time and material.

15        Q.   Now, let's go back for a minute to your

16   diagnosis of Bell's palsy.  Can you explain to the

17   ladies and gentlemen of the jury what that diagnosis is

18   and means?

19        A.   So it's a paralysis of half your face that

20   affects your nerves that controls your mouth, nose and

21   eyes and ear, and the official -- the official

22   explanation, that is, you can Google it, is caused by

23   either a virus or stress.

24        Q.   Okay.  So --

25        A.   So that --

Page 138

1      Q.   There's no question pending.  With regards to

2   the paralysis of half of your face, you currently have

3   no paralysis in your face, correct?

4      A.   Currently, now?

5      Q.   Yeah.

6      A.   No.  I still have -- how do I say it?

7   Permanent damage from the Bell's palsy.

8      Q.   What is the permanent damage?

9      A.   I have -- there's nerve damage.  My eye is

10   drastically, drastically more sensitive in my left eye,

11   and my eyesight has drastically changed.

12           There's -- obviously, as a reaction, when I

13   do get very stressed, my left eye begins to twitch, and

14   if you Google -- you Google, there is and can be

15   permanent damage that will never be changed.  In some

16   people, the paralysis is permanent, but there's also

17   permanent effects to, obviously, my sensitivity in my

18   left eye drastically.

19      Q.   Your paralysis was not permanent, correct?

20      A.   No, but there -- there is a --

21      Q.   I have no -- I have not asked a question.

22           And that's good, right?  I mean, you must

23   be glad that your paralysis was not permanent, right?

24      A.   Yeah.  Now, paralysis meaning full paralysis.

25   There's partial still.  There's partial.

Page 139

1      Q.  Now, when did the full paralysis, thankfully,

2   end for you?

3      A.  Well, it didn't end.  Again, the full paralysis

4   has never went away.  I mean, I still have -- my left

5   eye is slightly sleepy.  Okay?  There's still -- my left

6   eye is drastically drier, meaning I have to have more

7   drops.  So it never fully went away.

8              Now, did I recuperate maybe 80, 90 percent?

9   It took about six months.

10     Q.  So you were still working at Kilgore when 80,

11  90 percent recovery occurred, right?

12     A.  Yes.

13     Q.  And let me ask you something.  I know that

14  you've told me you're making way more than you ever made

15  at Kilgore, so would it be correct to assume that Bell's

16  palsy has not affected in any way, shape or form any

17  major life activity?  I mean, you can work, can do

18  everything even better than before?

19     A.  No.  I can't say better than before.  It's

20  affected my eyesight.  I can't read a menu in a

21  restaurant.

22     Q.  How old are you?

23     A.  Forty.

24     Q.  What doctor treats you for this?

25     A.  I've only -- when it happened, I went to two

Page 140

1    doctors, Saint Luke's, and I went to Spring Creek --

2    Spring Creek Neurologist to get the -- to get the

3    understanding of the nerve damage, and then I had an MRI

4    at Memorial.

5        Q.  When was the last time you visited a doctor

6    with regards to your Bell's palsy diagnosis?

7        A.  Oh, yeah.  It's been -- I think the last time

8    was in '19, when I went to the neurologist, but I've

9    been meaning to go to an eye doctor to see how bad it

10   is.

11       Q.  So wait a minute.  Since 2019, you haven't been

12   to the neurologist.  So let me ask you, since 2019, have

13   you seen an eye doctor?

14       A.  No.  I went to what you call a naturopath,

15   where she's the one that said I had -- what's that gray

16   stuff in the eye called?

17       Q.  No idea.

18       A.  Anyway --

19       Q.  So even though you've been told that you have

20   something in your eye since 2019, you've done nothing

21   about it?

22       A.  No.

23       Q.  And you are working and living and breathing,

24   and nothing major in your life has changed for you other

25   than knowing that your eyesight is not great and not

Page 141

1    being able to read a menu at a restaurant, correct?

2         A.   Yeah, but I've been meaning to go.

3         Q.   But even though you've been meaning to go for

4    the last three years, you haven't gone to a doctor,

5    eyesight doctor, correct?

6         A.   Correct.

7         Q.   Okay.  Other than your eyesight and reading a

8    menu, anything else that your current situation limits

9    you in?

10        A.   Yes.  It affects my left eye.  As you can tell,

11   I'm rubbing it because it's irritated.

12        Q.   So it affects your left eye, meaning it gets

13   irritated?

14        A.   Yeah, very dry, drastically drier.

15        Q.   Does that irritation limit any of your major

16   life activities like walk, breathing, eating, listening?

17        A.   I think it affects my driving.

18        Q.   You cannot drive?

19        A.   I can drive, but knowing my vision is different

20   can -- can be -- can be dangerous as this continues to

21   get worse.

22        Q.   And even though you know it could be dangerous,

23   since 2019, you have not decided and opted not to visit

24   an eye doctor, correct?

25        A.   Not that I've not decided.  I've tried to make

Page 142

1    appointments, but with me trying to --

2         Q.  What has happened?  I mean, you've tried to

3    make appointments?  You've called?

4         A.  Yes.

5         Q.  And what has happened?

6         A.  Well, some -- during the Corona, some of the

7    doctors were -- some of the doctors were closed.

8         Q.  But they did teledoc visits or virtual visits?

9         A.  No.  I didn't schedule a virtual visit.  They

10   can't see my eye on a virtual visit.  But, yes, I have

11   not -- I've tried, but knowing this is going on and this

12   needs to be documented, I will.

13        Q.  How many times have you tried to make an

14   appointment with an eye doctor?

15        A.  In the last three years, probably three or four

16   times.

17        Q.  And what has happened?  So you mean to tell me

18   that those three or four times, doctors -- you've not

19   been able to do an appointment or doctors have canceled

20   or what?

21        A.  No.  There was twice that I canceled because of

22   work and family.

23        Q.  And the other two times?

24        A.  I think one time, I had realized that that

25   doctor had recently decided to close during the

Page 143

1    pandemic, and I don't remember the fourth time.

2        Q.  At any point in time during your employment

3    with Kilgore, did you request accommodation for your

4    Bell's palsy?

5        A.  Accommodation?

6        Q.  Uh-huh.  No?

7        A.  No.

8            MS. ALFARO:  I think I'm done, but let's

9    just take a five-minute break so I can review my notes

10   and we can come back.

11           THE WITNESS:  Okay.

12           (A recess was taken.)

13           MS. ALFARO:  Are we ready to go back on the

14   record?

15           THE REPORTER:  Yes.  Go ahead.

16           MS. ALFARO:  Mr. Carmona, I remind you that

17   you're under the same oath as this morning, and I'm

18   going to pass the witness right now.

19           THE WITNESS:  Okay.  Yes.

20           MR. HODGES:  Thank you, Ms. Alfaro.

21                    EXAMINATION

22   BY MR. HODGES:

23       Q.  Mr. Carmona, I just have a couple of follow-up

24   questions, and then likely, after my follow-up

25   questions, Ms. Alfaro may have just some brief follow-up

Page 144

1    questions to go over what you responded from there.

2              So first, I just want to ask, in regards to

3    your commission sales reports, when did you normally

4    receive those reports?

5         A.   Monthly.

6         Q.   And can you explain the details of those

7    reports as to the time frame that it covered?

8         A.   So the reports were ran monthly, and they were

9    based off when we got paid by our customers.  So they

10   were not off what I sold.  They were based off what we

11   had already gotten paid, meaning Kilgore had collected

12   the check from their bank, and that was run and the

13   statement.

14        Q.   And when you received those statements, did you

15   also receive a commission check or a bonus check

16   supplemented with that report?

17        A.   No.  That would -- that was some -- that was a

18   good question.  I would get the statement, and then it

19   would take weeks, which was another part of my

20   frustration.  Mine would take weeks, if not sometimes

21   months, after the other guys got theirs.

22        Q.   And how would you know that the other guys

23   received theirs?

24        A.   Because we would ask each other, did you get

25   paid on your statement, did you even get your statement.

Page 145

1    Q.  And so --
2    A.  There was times where, you know, it was -- it
3  was obviously visible he had got his check, and I hadn't
4  got mine.
5    Q.  Do you remember specifically what times, you
6  know, years, maybe months when that occurred?
7    A.  Yeah.  It was specifically in '16 where that
8  payout took actually from -- the statement was in '16 of
9  December, and I didn't get paid actually till February
10  of '17 for that one.
11    Q.  And if it was December -- or the statement was
12  given out, when was it expected that you would receive a
13  payment?  Is there a time frame in your contract, or was
14  there a customary time in which you should be receiving
15  a payment?
16    A.  It was typically customary that you would get
17  paid on the following pay period, which was the
18  following week.
19    Q.  And is that spelled out anywhere, or is that
20  just kind of, like you said, customary within the
21  organization?
22    A.  It was just customary.  That's why that would
23  begin the -- the frustration of battles and arguments.
24    Q.  How did you receive those commission reports?
25  Was it via email?  Was it hard copy documents that are

Page 146

1    given to you?

2        A.   Email.

3        Q.   And who were those emails sent from?  Was that

4    from Paul?

5        A.   From Paul, yes.

6        Q.   Okay.  And, then, you also mentioned that there

7    were delays in payment for statements that were over

8    20k?

9        A.   Yes.

10       Q.   And I think you mentioned that you couldn't

11   recall, you know, specific instances in which, you know,

12   those that were payment -- were paid, but do you

13   remember at this time as to when?

14       A.   Yeah.  And then -- and then, actually, December

15   of '18, that's kind of around when the argument

16   happened.  Around the time I got Bell's palsy, I was

17   specifically asking for my statement, which sparked the

18   argument, which sparked the HR meeting.

19       Q.   Okay.  And so I'm going to pull up a document

20   that is going to be labeled Plaintiff's Exhibit 1.  Let

21   me share my screen with you.

22            (Deposition Exhibit 1 was marked.)

23       Q.   (BY MS. ALFARO)  Can you see this email?  Do

24   you need to zoom in?

25       A.   I can see it, yes.

Page 147

1          MS. ALFARO:  Can you please zoom it in so

2     that I can see the entire email?

3          MR. HODGES:  What?  Zoom out so you can see

4     the entire email or -- because the email that we're

5     going to look at is right here.  This is Carmona 0001,

6     and it's just the top of this where it's forwarded

7     information.  But this is going to be what we're looking

8     at.

9          MS. ALFARO:  Got it.

10     Q.  (BY MR. HODGES)  So, Mr. Carmona, can you see

11     this email?

12     A.  Yes.  Yes, I can.

13     Q.  Do you remember -- can you tell me the date

14     this email was received?

15     A.  Yes, November 9, 2020.

16     Q.  And did you receive this email?

17     A.  Yes.

18     Q.  And who was it from?

19     A.  Paul Therriault.

20     Q.  And again, who is Paul Therriault?

21     A.  He is my supervisor.

22     Q.  Okay.  And can you just briefly read the email

23     right here?

24     A.  Yes.  "Hey, Rudy, I'm not sure if you still use

25     this personal email address that I had on file, but I

1    just wanted to let you know that I finished out your

2    October sales reports and delivered copies to Jeff and

3    Jim" -- Jim -- well, let me finish reading -- "to Jim to

4    see if they are willing to disburse anything

5    posttermination.  If you have any questions, you might

6    contact Jim Perkins, the HR director."

7         Q.   Okay.  Well, let's go through this a little

8    bit.  So in regards to the October sales report, what is

9    that?

10        A.   He's -- he's basically running the report for

11   the last month I was employed there.

12        Q.   And up until that time, was there any other

13   outstanding sales reports that were not paid?

14        A.   I think -- I think I did not get my September

15   either, yeah.

16        Q.   You say that you were not paid, or did you not

17   receive the actual sales report?

18        A.   I did not get that.  So typically -- typically,

19   the month lags behind, meaning you can't actually run

20   the report in the actual month.  So if I was fired on

21   October, typically, the September statement's given at

22   the end of October, right?  So I didn't get the

23   September report either.

24        Q.   Okay.  And so when he says he delivered copies

25   to Jeff and Jim, did you receive a copy?

Page 149

1      A.   No.

2      Q.   And where it states in the email that if they

3   are willing to disburse anything, can you explain what

4   you believe that to mean?

5      A.   It means they were going to want to decide if

6   they wanted to pay me or not, but obviously, by

7   disbursing, meaning he's acknowledging that there's

8   money.

9      Q.   And was it your understanding that this

10   commission or money was discretionary?

11      A.   No.  It was ultimately not discretionary based

12   off how I performed.

13      Q.   So was this something that was earned prior to

14   your termination?

15      A.   Yes.

16      Q.   Do you know if Kilgore has any rules or

17   procedures in regards to paying employees after

18   termination or after their employment ended?

19      A.   No.  There's no rules.  I've heard of them

20   paying people, and I've heard of them not paying people.

21   But there's nothing in the employee handbook.

22      Q.   And so, when you mentioned earlier 160,000, was

23   that your estimate or guess as to the October sales

24   report?

25      A.   Yes.  That's my guesstimate based on mostly

Page 150

1    everything being closed except for the lab job for

2    Halliburton.  The moment I was getting terminated was

3    the moment I was getting the POs.  So I have no --

4        Q.  When you say -- oh, go ahead.

5        A.  So I have no recollection how that job went

6    because I didn't oversee it, but I'm the one that sold

7    it.

8        Q.  Okay.  And so, when you say you received the

9    POs, is that part of the procedures that, you know --

10   actually, scratch that.

11            Can you kind of explain the procedures of

12   once, you know, you receive a PO, leading up to that

13   turning into a commission?

14       A.  So the POs is just the notice to proceed with

15   the projects after everything's estimated and quoted.

16   So we get the PO from either a GC or an end user, like

17   Halliburton, saying here's your notice to proceed,

18   here's the official document and PO, and, then, that's

19   how we proceed at a project.  But we get paid after the

20   project is completed and paid for.

21       Q.  Okay.  And so, for the last project that you

22   said you received a PO for, did you complete the work or

23   estimates for that specific client?

24       A.  I -- I estimated it.  I sold it.  I did not get

25   to project manage it because the job was barely about to

Page 151

1    start, but I sold it.  And I was the only reason we got

2    the job because D.E. Harvey's relationship with Kilgore

3    is very bad.  They do not like Kilgore.

4                  D.E. Harvey is one of the biggest general

5    contractors in Houston.  They do all the downtown work,

6    all the Halliburton work, all the FMC work, all the

7    large oil and gas companies.  They pretty much do

8    90 percent of all the downtown building high rises.

9        Q.  And did you having to project manage certain

10   projects or be in that role on certain projects, was

11   that the primary reason of why you received these

12   commission bonuses?

13       A.  No.  It was -- it was apart from all three,

14   right?  I sold them at a -- I sold them correctly, at a

15   correct margin, to make -- make money for the company

16   and me.

17                  Then I estimated them correctly, and I

18   project managed them correctly, meaning I managed the

19   manpower correctly.  I managed the equipment costs, the

20   material costs, the scheduling.  I mean, it's very

21   essential to schedule these projects correctly so that

22   they come in at budget or under budget, and I was very

23   well-known to bring these projects in under budget to

24   make more money for me and the company.

25       Q.  And so you said the project in which you

Page 152

1    received the PO on the same day as you were terminated,

2    that was Halliburton.  Is that correct?

3         A.  Well, it was actually the -- it was the PO --

4    it was for D.E. Harvey.

5         Q.  D.E. Harvey.  Okay.

6         A.  But it was Halliburton's site.

7         Q.  Gotcha.  And do you know if that project was

8    ever completed?

9         A.  Yes, it was completed.

10        Q.  And how do you know that?

11        A.  Because I still talk to Halliburton.  They're

12   my customer.

13        Q.  Okay.  And so do you believe that you -- you

14   were owed commission on that project specifically?

15        A.  Yes, because I know specifically from

16   D.E. Harvey and Halliburton people, they did not want to

17   give it to Kilgore.  The relationship was me.  So

18   that -- that entire project is -- specifically, key

19   component is me.

20        Q.  And do you know the estimate time as to how

21   long that project would take to get completed?

22        A.  I think that project took about three months.

23        Q.  And so after the three months, the project's

24   completed.  Kilgore would have been paid in full, and at

25   that time, there should have been some type of

Page 153

1    commission for you.  Is that your understanding?

2         A.  Yes.

3         Q.  Okay.  And so that's -- that and September and

4    October sales reports, does that in sum equal the

5    160,000 which you were referring to during the

6    deposition?

7         A.  No, because the October would not show the lab

8    job.

9         Q.  Well, yes.  So what I'm saying is that the last

10   job, plus the October report and the September report,

11   is that -- is that --

12        A.  Yes, yes.

13        Q.  -- that 160, or is it only 160 for the October

14   report and the September report?

15        A.  No.  It's for all three, September, October and

16   the lab job.

17        Q.  Okay.  And you believe that -- you stated that

18   the -- you believe -- well, you know that the

19   Halliburton -- or that project was completed?

20        A.  Yes, sir.

21        Q.  And do you know if Halliburton paid in full?

22        A.  Yes.

23        Q.  And how do you know that?

24        A.  I mean, I -- I was told by -- I was told that

25   the job was complete.

Page 154

1    Q.  Okay.  But earlier in the deposition, you

2    mentioned -- you said that you wanted to elaborate on

3    what you were mentioning in regards to the sales quotas

4    and that yours was different and that that was racist.

5    And so I just wanted to give you an opportunity to

6    elaborate, or is there any, you know, further testimony

7    that you wanted to give in regards to your testimony

8    that you believe that it was racist for them to

9    manipulate your sales quota compared to --

10   A.  Yes, yes.  So two things with the increasing my

11   sales quota.  One, he's trying to prove that I cannot

12   meet my quota to ownership, but my frustration was me

13   and Steve Saitas started March of 18, 2013.  Why is my

14   quota constantly increased by hundreds of thousands of

15   dollars and Steve is not?  We started on the same day.

16   We have the same responsibilities.

17          You're just trying to make it look like I

18   can't do my job rather than reward the guy that has

19   actually held the department up financially for seven

20   years.  You want to make me look like I'm not doing my

21   job.  But, of course, I always -- I always maintain my

22   quota easily.

23   Q.  And when you're referring to, you know, the

24   person, you're referring to -- is that Paul you're

25   referring to?

Page 155

1        A.   Yes.

2        Q.   Okay.  And how often or how many times did your

3   sales quota change during your employment?

4        A.   It would change yearly, but it started to

5   change drastically when the frustration began in 2016.

6   I think, as an example -- now, I know my quota got up to

7   about, I think, 2 million, and I think Steve was still

8   at, like, 1.5.

9        Q.   So you said that your quota would change each

10  year, correct?

11       A.   Yes.

12       Q.   Did you have to sign any forms or documents

13  that says, hey, this is your new quota for the year?

14       A.   No.  It was just presented in an email that

15  this was my new quota.

16       Q.   So you didn't have any say or, you know,

17  agreeance to that?

18       A.   No.  I didn't -- I didn't agree to it.  I was

19  just told this is what my new quota was.

20       Q.   Do you know if -- was there a sales agreement

21  in place or an agreement in place when you first signed

22  up?

23       A.   Yes.  There was a -- there was a sales plan

24  presented to me as to if I sold this much at this

25  percentage, this would be my -- my commission.

1        Q.   And so can you just kind of explain -- can you

2    explain the difference between your salary and kind of

3    the quotas and kind of -- if there's a difference there

4    or if there's something that can be explained.

5        A.   Well, basically, if I -- if I sold a million

6    dollars, I had to cover my salary of 60,000 based off --

7    based off the plan.  So in the first year, say, for

8    example -- say, for example, I sold a $20,000 job and

9    there was cost of $10,000 with overhead, there was

10   $10,000 profit.  I would get 5,000.  That was the way it

11   started.

12                Now, it changed several times, and towards

13   the end, if I sold -- if I sold $20,000 at 50 percent

14   with $10,000 cost, instead of 5,000, I got 2,000.

15                And then it went from 50 percent to

16   20 percent.  That's a drastic change for somebody who

17   tore the ceiling open when they were used to 1.2 and was

18   doing 3 and 4 million, so --

19                MR. HODGES:  I want to pull up another --

20   and this is going to be Plaintiff's Exhibit 2.  This is

21   Bates labeled Carmona 0008.

22                (Deposition Exhibit 2 was marked.)

23       Q.   (BY MR. HODGES)  Can you see this, Mr. Carmona?

24       A.   Yeah.

25       Q.   All right.  And can you explain what this is?

Page 157

1      A.  This is the exact spreadsheet I was talking

2    about.  This is the -- this is the Halliburton job, and

3    this is the agreement, T&M, maintenance.  If you sell a

4    job over 200,000, I am expected to do 17 to 20 percent

5    profit.  Now, if you can see the highlight.

6      Q.  Mr. Carmona, I think you may have froze.

7              MS. ALFARO:  While he's frozen, I'm going

8    to object to this exhibit because it doesn't seem to be

9    complete.  It's an incomplete document.

10             MR. HODGES:  And I was assuming that you

11   probably would have the complete documents or as many

12   documents that were sent over.

13             MS. ALFARO:  Can you scroll down so that I

14   can look at it?

15             MR. HODGES:  Oh, sorry.

16             MS. ALFARO:  Yeah.  Okay.  Thank you.  My

17   objection still remains the same, and there's no way of

18   identifying when this was created, by whom or when or

19   whatnot.

20             THE REPORTER:  He dropped off, so I'll just

21   go off the record till he comes back on.

22             MS. ALFARO:  Okay.

23             (A recess was taken.)

24             MR. HODGES:  All right.  Reporter, can we

25   get back on the record?

Page 158

```
 1              THE REPORTER:  Okay.
 2              MR. HODGES:  We're back on?
 3              THE REPORTER:  Yeah.
 4      Q.  (BY MR. HODGES)  So, Mr. Carmona, do you see
 5  this document here?
 6      A.  Yes.  Yes, sir.
 7      Q.  Okay.  And can you explain or -- you know, who
 8  created this document?
 9      A.  Paul created this document.
10      Q.  And how do you know Paul created this document?
11      A.  Because it was sent from his email.
12      Q.  And so was this document in an attachment to an
13  email from Paul?
14      A.  Yes.
15      Q.  Do you remember when this document was sent,
16  maybe a date or a specific month as to when this
17  documented was attached and emailed?
18      A.  Yes.  It was sent end of November of 2016.
19      Q.  And do you by chance have a copy of that email?
20      A.  Yes, I -- yes.
21      Q.  And have you produced that email?
22      A.  Yes.  I think I've produced -- I've sent it to
23  y'all.  That's why y'all have this.
24      Q.  And so was this document altered in any way
25  once -- from what you received?
```

Page 159

1    A.  Yes.  He doctored the percentages on the right

2    side.

3    Q.  No, not in regards to what Paul did.  I'm

4    asking you, so as here, as this is the document here,

5    did you do anything to this document from what Paul sent

6    you?

7    A.  No.

8    Q.  So is this in the same format as from what you

9    received --

10    A.  Yes.

11    Q.  -- from Paul?

12    A.  Yes.

13    MS. ALFARO:  I'm going to reiterate my

14    objections to the document.  This document presented as

15    Exhibit 2 is incomplete, and there's no way of verifying

16    the same as it stands right now and is attempted to be

17    included in the deposition.

18    Q.  (BY MR. HODGES)  And, Mr. Carmona, you know,

19    like you said, that document is in an email sent from

20    Paul sometime in 2016.  I think he's frozen again.

21    (A recess was taken.)

22    MR. HODGES:  Can we go back on the record?

23    THE REPORTER:  Back on the record.

24    Q.  (BY MR. HODGES)  All right.  Mr. Carmona, I'm

25    just going to pull up that last exhibit one more time,

Page 160

1    Plaintiff's Exhibit 2.

2              Mr. Carmona, is this what you consider your

3    sales commission reports that you were referring to

4    throughout this deposition?

5         A.  No, no.  This is -- this is just a breakdown of

6    one job.  The -- I think I emailed the reports.

7         Q.  Can you say that again?  I'm sorry.  I think my

8    audio was out.  I didn't get your answer.

9         A.  No.  This is not what my sales report looks

10   like, no.  My sales report is four pages.

11        Q.  Okay.  And so can you just kind of give me a

12   little more -- what is this?

13        A.  This is just a breakdown of one job.  So he --

14   this is -- this is what is on our sales plan on the

15   left, and this spreadsheet is something he just copied

16   and pasted and put it on an email on the right.

17        Q.  Okay.  Going off of this, I said I had, like,

18   two more follow-up questions for you.  Thanm, a guy

19   named Thanm, do you know who his supervisor was?

20              MS. ALFARO:  Oh, no.  I think he's froze.

21        A.  Yeah.

22        Q.  (BY MR. HODGES)  Can you hear me?

23        A.  Can you hear me?  Yeah, I can hear you.  Repeat

24   the question.

25        Q.  Yeah.  Do you know who Thanm's supervisor was?

Page 161

1          A.   Yes, Paul Therriault.

2          Q.   And you mentioned that Thanm was -- had access

3     to direct clients?

4          A.   Yes.

5          Q.   And you did as well?

6          A.   Yes.

7          Q.   So y'all both had access to direct clients?

8          A.   Yes.

9               MR. HODGES:   I have no further questions.

10    I'll pass the witness.

11              THE REPORTER:   Anything further for the

12    record?

13              MS. ALFARO:   I have no questions at this

14    time.

15              THE REPORTER:   Anything further for the

16    record?

17              MS. ALFARO:   Not at this time.   We

18    reserve -- Eddie, we can't hear you.   I know you're

19    talking.

20              MR. HODGES:   Can you hear me now?

21              MS. ALFARO:   Yeah.

22              MR. HODGES:   Yeah.   Before we go off the

23    record, I would like to do a read and sign.

24              THE REPORTER:   Okay.   We're off the record.

25              (End of proceedings at 1:32 p.m.)

Page 162

```
 1                   CHANGES AND SIGNATURE
 2   WITNESS NAME: RUDY SAM CARMONA   DATE: APRIL 8, 2022
 3   PAGE LINE      CHANGE            REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13          I, RUDY SAM CARMONA, have read the foregoing
     deposition and hereby affix my signature that same is
14   true and correct, except as noted above.
15                    _____
                      RUDY SAM CARMONA
16
     THE STATE OF _____)
17   COUNTY OF _____)
18          Before me, _____, on
     this day personally appeared RUDY SAM CARMONA, known to
19   me (or proved to me under oath or through
     _____) (description of identity
20   card or other document)) to be the person whose name is
     subscribed to the foregoing instrument and acknowledged
21   to me that they executed the same for the purposes and
     consideration therein expressed.
22          Given under my hand and seal of office this
     _____ day of _____, _____.
23
24                    _____
                      NOTARY PUBLIC IN AND FOR
25                    THE STATE OF _____
                      COMMISSION EXPIRES: _____
```

Page 163

1    STATE OF TEXAS   X

2    COUNTY OF DALLAS X

3         I, LISA M. DURHAM, Certified Shorthand Reporter

4    duly commissioned and qualified in and for the State of

5    Texas, do hereby certify that there came before me on

6    April 8, 2022, at the location of the witness in the

7    City of Porter, County of Montgomery, and State of

8    Texas, the following named person, to wit:  RUDY SAM

9    CARMONA, who was duly sworn to testify the truth, the

10   whole truth and nothing but the truth of his knowledge

11   touching and concerning the matters in controversy in

12   this cause; that he was thereupon examined upon his oath

13   and his examination reduced to typewriting under my

14   supervision; that the deposition is a true record of the

15   testimony given by the witness and that signature of the

16   witness, pursuant to Federal Rules of Civil Procedure

17   Rule 30(e)(1)(A) and (B), as well as Rule 30(e)(2):

18        XXXXXX was requested by the deponent and/or a party

19   before completion of the deposition.

20        _____ was not requested by the deponent and/or a

21   party before the completion of the deposition;

22        And that the amount of time used by each party at

23   the deposition is as follows:

24        MS. ALFARO: 03:27:02

          MR. HODGES: 00:00:00

25

Page 164

1      I further certify that I am neither attorney for,
2  nor related to or employed by, any of the parties to the
3  action in which this deposition is taken, and further
4  that I am not a relative or employee of any attorney or
5  counsel employed by the parties hereto or financially
6  interested in the action.
7      Given under my hand and seal of office on this the
8  14th day of April, A.D., 2022.
9
10
11
12
13  Lisa M. Durham, Texas CSR #6651
    Veritext Legal Solutions
14  Firm Registration #571
    300 Throckmorton Street
15  Suite 1600
    Fort Worth, Texas  76102
16  (817) 336-3042
    Expiration Date:  01/31/24
17
18
19
20
21
22
23
24
25